WILLIAM F. JOBBINS, IMPLEADED, ETC.,

V.

MRS. E. C. GRAY ET AL.

*Sales—Realty—Bills of Vendor for Specific Performance—Fraudulent Misrepresentations and Deficiency in Quantity Sold—Title of Vendor, Proof as to—Construction of Contract—Implied Covenants—Decree for Purchase Money.*

1.. In an action by the vendor against the vendee to obtain specific performance of a contract for the purchase of land, where the defense was that the vendor had made fraudulent misrepresentations to induce the sale and that there was less land than the contract called for, this court holds that the vendee failed to show by a preponderance of testimony that he had failed to get the quantity of land contracted for, and that there was a total failure of proof to charge vendor with fraudulent misrepresentations.

2.   Where a vendor tenders to a vendee a warranty deed in proper form and the vendee refuses it, but does not pretend that such refusal is because vendor has not good title and no such claim is made in the answer to vendor's bill for specific performance, and the point is first raised in argument after the close of the testimony, the court should then allow the vendor to introduce proof, upon his offer to do so, showing title.

3.   A party will never be allowed to take advantage of his own wrong, or of the errors of the court induced on his own motion.

4.   In the case presented, the " one-half of the water power of the river " mentioned in the contract had reference only to the one-half of the water power on the east side of the river and adjacent to the land conveyed.

5.   Covenants in contracts will only be implied when the court can clearly see that such was the intention of the parties, or when such covenants are necessarily implied to effectuate the purpose of a contract.

6.   A decree for the balance of the purchase money was correct in the case presented.

[Opinion filed December 16, 1889.]

APPEAL from the Circuit Court of Kane County; the Hon.
ISAAC G. WILSON, Judge, presiding.

Mr. CHARLES WHEATON, for appellants.

In order for a vendor to enforce against the vendee the
specific performance of a contract in the sale of land, his title
must be free from suspicion.   Brown v. Cannon, 5 Gilm. 174;
1 Sugd. on Vend. 339 ; Morgan v. Smith, 11 Ill. 194; Hoyt
v. Tuxbury, 70 Ill. 331; Page v. Greeley, 75 Ill. 400; Stapyl-
ton v. Scott, 16 Ves. 272 ; Lowes v. Lust, 14 Ves. 547 ; Drew
v. Clark, 9 Ves. 368 ; Sheffield v. Mulgrave, 2 Ves. 526 ; Roak
v. Kidd, 5 Ves. 642.

By the contract Gray agreed to convey, by good and suffi-
cient deed, free from all incumbrances, one-half of the water
power of Fox river controlled by the Joseph Stolp dam as
shown on the maps of Kane county.

In order to perform his contract it was necessary that Gray
should have an undoubted title to the water power which said
dam controlled.   The map showed that dam as extending clear
across the river, abutting upon the west as well as upon the
east side of the river.   The evidence shows that the height
of that dam, when at its true height and in repair, was three
or three and one-half feet, thereby creating a water power and
controlling the same, to the extent of a power created by a
dam of that height at that point.   The evidence further showed
that with the dam at that height the water would be set back for
a half or three-quarters of a mile, or more, and overflow the
land upon both sides of the river.   In order, then, for Gray to
convey good title to the water power controlled by said dam,
or one-half of the water power of Fox river at that point con-
trolled by the dam, and to enforce a specific performance of
the contract, it was necessary for him to have, and to prove,
a good title to an anchorage upon both sides of the river to
said dam, and the right of overflow which would be caused by
said dam.

He did not prove on the trial of this case that he had either,

or that he had the right to rebuild or repair said dam, or to raise it to the height which it had before been used at. It appeared from the evidence that at the time of the execution of the contract there was no dam there, but it had been broken down and unused for years. But in his contract, however, Gray substantially asserts that he had a right to rebuild and replace said dam so as to control one-half of the water power of Fox river by said dam at that point, and agreed in his contract to convey that right by a good title free from incumbrances.

The maxim of the law is, that whoever grants a thing is supposed also tacitly to grant that without which the grant would be of no effect; and accordingly whenever a thing is granted, all the means to attain and all the fruits and effects of it, are granted also, and will pass, inclusive, together with the thing, by the grant of the thing itself, without the words "with appurtenances" or any like words. Angell on Watercourses, Secs. 158, 159, 165.

By the grant of a mill, with the appurtenances, the dam and all privileges of flowing which are necessary to the full enjoyment of the mill and head of water will pass. Angell on Watercourses, Sec. 358, p. 402.

The grant of half a dam conveys with it half the water power; so the reservation of a mill site embraces not only the land of such site, but also a right of flowage of a pond for the use of the mill. Washburn on Easements, p. 34, Secs. 9 and 10; Oakley v. Stanley, 5 Wend. 525; Lampman v. Mills, 21 N. Y. 505; Stackpole v. Curtis, 32 Me. 383; Wilcoxon v. McGhee, 12 Ill. 381; Hadden v. Shoutz, 15 Ill. 581; Wheelock v. Thayer, 16 Pick. 68; Adams v. Conover, 87 N. Y. 422.

It will be seen by these cases the only defect in the grantor's title was a want in the grantor of a right to flood the other lands which the dam would necessarily flood and which the grantor did not own, and that defect in the title was held to be sufficient to amount to a breach of the covenants of a deed of water power.

Certainly, then, it would be a good defense to a bill for specific performance brought by the vendor to enforce a con-

tract for the purchase of water power. See, also, Green v. Collins, 86 N. Y. 246. And as to the right of flowage being an essential part of grant of water power, see Wilcoxon v. McGhee, 12 Ill. 381; Hadden v. Shoutz, 15 Ill. 581.

To apply the above principles enunciated to this case:

Gray, in the contract he seeks to enforce, agreed to convey one-half the water power of Fox river controlled by the Stolp dam as shown upon the maps of Kane county.

He therein, by reason of his contract, agreed to convey by a good title the right to flood all the lands north of the dam, which the dam at its usual height would overflow.

If he had not a good title to such overflow he could not perform the contract on his part, and therefore was not entitled to a performance of the contract by the defendant.

In order to entitle him to a decree, he not only had to allege, but to prove, that he had a good title to such overflow, which he did not do.

Messrs. BOTSFORD & WAYNE, for appellee.

C. B. SMITH, J. This was a bill for specific performance brought upon the following contract:

"Articles of agreement made and entered into the third day of March, in the year one thousand eight hundred and eighty-three, between Allison H. Gray, manufacturer, of the city and county of Erie, in the State of Pennsylvania, party of the first part, and Warren Tyler, real estate agent of the town of Aurora, in the county of Kane, in the State of Illinois, party of the second part, in manner following: The said party of the first part in consideration of the sum of one dollar to him duly paid, the receipt whereof is hereby acknowledged, hereby agreed to sell unto the said party of the second part, or to his assigns or legal representatives, all that piece or parcel of land situated in the southwest quarter, section ten (10), township of Aurora thirty-eight (38), range eight (8), in the county of Kane in the State of Illinois, described and known in the assessor's map of said county as the Gill property; lot 4, containing eleven and eighteen one-hundredths (11 18-100)

acres of land, and including one-half of the water power
of the Fox river controlled by the dam thereon known as the
Joseph Stolp dam and which is more fully specified upon the
map of said township, recorded in said county, for the sum of
seven thousand and five hundred dollars, which the said party
of the second part hereby agrees to pay to the said party of
the first part, as follows: The sum of two thousand dollars
upon the execution hereof, the further sum of two thousand
dollars on or before the third day of September next with
interest at six per cent (6 per cent) per annum, and the
remaining balance hereof, to wit, three thousand and five hun-
dred dollars with interest at the rate of six per cent (6 per
cent) per annum, on or before one year from the date hereof,
and the said party of the first part on receiving such payment
at the time and in the manner above mentioned shall, at his
own proper costs and expense, execute, acknowledge and deliver
to the said party of the second part, or to his assigns, a proper
deed for the conveying and assuring to him or them the fee
simple of the aforesaid premises, free from all incumbrances,
which deed shall contain a general warranty and the usual full
covenants.

" And it is understood that the stipulations aforesaid are to
apply to and bind the heirs, executors, administrators and
assigns of the respective parties.

" In witness whereof the parties to these presents have here-
unto set their hands and seals the day and year first above
written.

> " A. H. GRAY,      [SEAL.]
> " WARREN TYLER.  [SEAL.]

" Sealed and delivered in the presence of A. H. Gray, Jr."

The bill avers that Wm. F. Jobbins, assignee of Warren
Tyler, paid the first two payments required by the contract,
but has failed and refused to pay the balance of the purchase
money.

The bill avers that the contract was duly assigned in writ-
ing on the back thereof by said Tyler to defendant, William
F. Jobbins, on the 2d day of October, 1883, and that the
contract and assignment were recorded in the recorder's office

of said Kane county, and that said Gray on the 3d day of
March, 1886, assigned said contract to Mrs. E. C. Gray; that
the first two payments upon said contract were paid, one on
the 3d of March, 1883, and the other about the 30th of
August, 1883, and there has nothing been paid on said con-
tract since; that said Allison P. Gray at the time of the mak-
ing of the contract was seized in fee simple of the real estate
described therein, and is still so seized, and has been and is
ready and willing to execute to said Jobbins a good and suffi-
cient deed thereof, free and clear from all incumbrances, upon
the payment of the amount due on said contract, and has offered
to deliver to said Jobbins such a deed, and demanded payments
of said Jobbins of said amount; that at the time of the making
of said contract said Tyler was let into possession of said
premises, and that he and Jobbins have been in possession
ever since; that complainant had to pay the taxes on said
premises for the years 1882 and 1884; that Thomas Nelson,
Anna M. Collins and Charles Collins claimed some interest in
said premises to said Jobbins and prays that defendant, Job-
bins, may be compelled specifically to perform said contract
by payment of the amount due thereon, and said taxes, etc.

The answer admitted the purchase and making the contract
for the land described, but avers that there was not 11 18-100
acres of land included in lot 4; that Gray did not and does not
have the title to one-half the water power of Fox river at that
point, and that the Stolp dam did not control one-half the water
power of Fox river at that point; that the dam nor any part
thereof did not rest on said land; that the race which once
connected with the dam had been washed away, and also that
the dam itself had been washed away at the date of the con-
tract; that the ground, the dam, the river and the race were all
then covered with ice so that appellants could not see the condi-
tion of the land, river, dam or race and so could not tell whether
there was in fact any dam or race there at all, or whether they
connected with each other, or whether any of the land had been
washed away or not; but on the contrary, that they were
obliged to and did rely upon the representations of said Gray
then made to him, that he in fact owned 11 18-100 acres in

said lot 4 and that the dam rested thereon, and that one-half of the water power of Fox river was controlled thereby in connection with said land. Jobbins further answers and says the land was purchased for him by Tyler for manufacturing purposes and for a mill site, which was well known to Gray, and that the most valuable part of the purchase was the water power, and that without the water power and race the land is not worth over $25 per acre; that Gray agreed to warrant to Tyler for Jobbins, that he, Gray, owned one-half the water power in Fox river at that point which was controlled by the dam, but that Gray did not own half the water power, and that the Stolp dam was broken down and washed out, and that if the dam was built up and repaired high enough to be of any value as a water power that then the dam would overflow the lands above the dam and across on the other side of the river, which Gray never had any right to overflow.

The answer then avers that all these representations on the part of Gray were false and fraudulent, and were so made to induce Tyler to buy the land for Jobbins at an extravagant price, and that Gray well knew such statements were false and fraudulent. The answer further avers that Jobbins lives in New York, and that after making the first two payments he came to Illinois and had the land surveyed, and found that it contained only 10 15-100 acres, and that he then discovered the dam was washed away and did not rest on the land, and that there was no connection between the dam and the race, and that he then demanded remuneration for such loss from Gray, which was refused, etc., and he denies the right of Gray to specific performance.

After filing his answer Jobbins filed a cross-bill setting up the same state of facts, and asked to have the contract canceled and a decree requiring Gray to pay back to him the money paid on the contract.

Tyler, who was made a defendant in the bill, answered, setting up about the same defense contained in Jobbins' answer.

Complainants answered Jobbins' cross-bill, denying all the material allegations made against them.

Thomas Nelson, who was made a defendant to the original bill of complaint, answered that the only interest he had in the land was that of a mere trustee for Anna M. and Charles Collins, in a trust deed to secure a loan on said land made by Jobbins and his wife to him as such trustee. This deed was made on the 5th of March, 1885, by Jobbins and his wife, to secure a loan of $14,269.

On the 3d day of March, 1886, Allison H. Gray assigned the contract to his wife, Mrs. F. C. Gray, by indorsement thereon.

On the 2d day of October, 1883, Warren Tyler assigned the contract to William F. Jobbins, by indorsement thereon. No question is made as to the propriety or legality of these assignments; indeed, on the part of Tyler, he was acting in the beginning for Jobbins, and in the first place took the title for Jobbins.

Upon the hearing below the court found all the issues involved in favor of complainants in the original bill, and decreed specific performance of the contract and dismissed the cross-bill.

From that decree appellant Jobbins appeals to this court and asks for a reversal, and insists that the findings and decree of the court are contrary to the evidence and the law.

There being no question as to the execution of the contract and its terms, we are only called upon to determine whether the defendants, Jobbins and Tyler, made out their defense by the proof, the burden being upon them. Two questions or defenses are raised in the answer: First, that there are only 10 15-100 acres of land, when the contract called for 11 18-100; second, the fraudulent representations relied on by defendant as having been made by appellee, Allison H. Gray.

And first as to the shortage in the land. Upon this point there is a conflict in the testimony. We are satisfied that this conflict and discrepancy arises from different surveyors following a somewhat different meander line along the irregular margin of the river, which has never been so definitely described by the original or subsequent surveys as to enable any surveyor to be able to know or follow the exact line. Both of the surveyors who testified for the respective parties, express the

difficulty of arriving at precisely the same result, or of ascertaining the exact amount of land along the irregular line of the river, on the west side of the strip of land involved in controversy. We think appellant fails to show that he did not get the amount of land described in the contract. The evidence does not preponderate in his favor upon that point.

Second, as to the charge of false and fraudulent representations set up in the answer and cross-bill. Upon this branch of his case appellant makes a complete and total failure in his proof. There is not a particle of proof of fraud or misrepresentation on the part of Allison H. Gray at the time of this sale, or before or since. Instead of Jobbins relying upon anything said by Allison H. Gray to his purchasing agent, Tyler, it is certain that both Jobbins and Tyler were acting on their own knowledge of the land, the dam and the race and its value as a water power, when they made the purchase. Gray lived in Pennsylvania and had obtained the title to this land through a foreclosure proceeding and had never seen the land himself, and knew nothing at all about it. Tyler was informed by Gray when he bought the land, that he, Gray, had never seen it, and knew nothing about its value or situation except as he had been informed by his agent whom he had sent to Aurora to see about the land, after Tyler proposed to buy it. That agent reported to Mr. Gray that the land was worth $10,000 and advised him not to sell it for less. Tyler, who was acting for Jobbins, was a resident of Aurora, had been for many years a real estate agent, and was perfectly familiar with the land, the river, the dam and the race, and knew as much about it as any man could know. In addition to his personal knowledge of the land, its location and value, he swears that he had been investigating the title to it before attempting to buy it. But, more than this, Jobbins himself, who was intending to use this water power for manufacturing purposes, went to Aurora a good while before making this purchase, and in company with his agent, Tyler, personally examined this river on both sides, and went up and down the stream and both were as fully advised as to the exact condition of things as it was possible for two men to be. If they misjudged

Jobbins v. Gray.

the location of the land, the river, the dam and 'race, it was certainly their own fault. They were buying land on the other side of the river of other owners, and it is utterly unreasonable to suppose that if this man was intending to buy valuable water power, with land adjacent, and pay a large amount of money therefor, for the purpose of himself erecting valuable mills, that he should not know what he was buying when on the ground 'with his agent for the express purpose of examining for himself, and that he was intending to or did rely on the representations of a man in a foreign State, who had never seen the land. Such a claim is preposterous. Tyler himself swears that he and Jobbins went all over this land and up and down on both sides of the river at different times before making this purchase, but seeks to evade the force of this fact, by saying that there was so much snow and ice around there that they could not tell that the dam was gone or that the race had no connection with the dam, or that the surrounding lands would be overflowed in case the dam was raised. This explanation we regard as wholly insufficient; but even if it was good as to Jobbins, it was no excuse at all for his agent, Tyler, who had lived there for many years and seen it in all seasons of the year. But even if Tyler and Jobbins had both been ignorant of the situation at the dam, there is not a word of proof that Gray knew or pretended to have any personal knowledge of it, or that he made any claim to know anything about the dam or the race except from the information obtained from his agent; nor is there any proof that he said anything about the location or the situation of the dam or race, except that his deed gave him that much land, which he insisted he had, and that it carried with it the right to half the water power of the river at that point. Tyler swears that he wanted to buy the water power and the land separately, but that Gray refused to do anything of the kind. Gray denies even that statement of Tyler and swears that he told Tyler he must take the land just as it was or let it alone.

Tyler and Jobbins both went to Pennsylvania to make this purchase and contract. Jobbins concealed himself in the city while Tyler made the contract, and prepared the papers him-

self and acted with full knowledge of everything affecting the value of the property, while Gray knew nothing except upon information.

The second payment of $2,000 was not paid until in September following, long after the ice and snow had left the river; and everything was open to Jobbins and his agent for months before this second payment was made, and the alleged fraud might have been discovered; but no claim was then set up of any such fraud. We think there is an entire failure to establish the alleged fraud.

Appellants urge still another reason why this decree should be reversed, viz.: The failure of appellees to prove that they had a good and valid title to this land. The proof is that before this suit was brought, Mrs. E. C. Gray, who then held the contract, had a good and sufficient warranty deed made and executed by herself and husband, containing all the usual and necessary covenants to convey a good and perfect title to said lands to William F. Jobbins, and tendered it to him or his attorney acting for him, and demanded the remainder of the purchase price, and made an offer to deliver the deed on payment of the balance of this purchase money, then long past due; the deed was refused and payment of the balance of the purchase money also refused, but appellant made no pretense then that such refusal was because appellee had no title to the land. Nor was any such claim made in the answer of either of the defendants. The first that was ever heard of this pretense that plaintiff had not proved his title showing that her deed conveyed title to appellants was after the evidence was closed and the argument begun. Then, for the first time, appellants' counsel raised the question and objected to the sufficiency of the proof for that reason. Thereupon appellees at once offered evidence to the court showing a perfect and clear title in themselves, to the land, but appellants objected to this proof as coming too late, and their objection was erroneously sustained by the court. Under the circumstances the court ought to have admitted the testimony. But the evidence is preserved in the record, and we can see from it that the plaintiff had a good and perfect title to the land.

Appellant can not be allowed to procure an erroneous rul-ing in his favor and exclude competent and material evidence on the trial when it is offered and ready to be produced, and then on appeal insist that for the want of that very proof the decree can not be sustained.   A party will never be allowed to so take advantage of his own wrong, or the errors of the court induced on his own motion, and then compel the oppo-site party to suffer the consequences.   Such a proceeding would be the merest trifling with the court.

We think the one-half of the water privilege referred to in the contract had reference only to the one-half of the water power of the river on the east side, and adjacent to the land conveyed, and to be used and enjoyed in such manner as the general contour of the land would permit for the purposes of a water power, as contemplated by the purchasers.   This is evident from the fact that Jobbins had already bought the land on the west side of the river and adjacent to this dam. He knew Gray had no right or interest in the water power on the west side of the river and he must have contemplated that the half interest he was buying could only relate to such use as could be made of the river by drawing water from the east side and adjacent to this land.   No other and reasonable construction can be given that part of the contract relating to the sale of one-half the water power, and this construction is sustained by Hadden v. Shoutz, 15 Ill. 581.

There is nothing in this contract to justify the claim that it contained an implied warranty that the purchaser might have the right to raise the dam high enough to throw the water back upon and submerge land above the dam.   That would be to interpolate a very broad and important covenant in the contract, which the parties themselves did not see fit to do. This we have no right to do.   Covenants in contracts will only be implied when the court can clearly see that such was the intention of the parties, or when such covenants are necessarily implied to effectuate the purpose of a contract. We think the contract in that respect amounted to nothing more than a quit claim to whatever power Gray had adjacent to his land.

The decree for the balance of the unpaid purchase money was correct under the authority of Corbin v. Teed, 69 Ill. 200.

After a careful study of this record and the elaborate argument of counsel for appellant we have been unable to find any error in this record, but on the contrary we think the evidence abundantly sustains the decree and it is affirmed.

*Judgment affirmed.*