# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—DECEMBER TERM, 1851.

PHILADELPHIA.

## Griffitts *et al.* *versus* Cope *et al.*

Devise of land to be conveyed to certain persons, or such others as the monthly meeting of the Quakers in Philadelphia should nominate, in fee, "there to build a meeting-house upon, if the members of that meeting shall agree to build a meeting-house there, but not else." The land was conveyed, and the meeting-house erected and used for more than a century. A new meeting-house was then erected on other ground, and the old one disused under a vote of the meeting, and sold, but the sale was never consummated. *Held,* 1. The devise was of a fee simple, and not of a qualified estate. 2. That the trustees, &c., may sell and convey, applying the proceeds to the same uses as those on which the land was devised.

CERTIFICATE from the *Nisi Prius.*

Ejectment.—In 1747, Samuel Powell, the younger, by his will, " authorized and directed his executors to grant unto such persons as the monthly meeting of the people called Quakers, in Philadelphia, shall nominate, their heirs and assigns for ever, and in trust for the same people for ever, sixty feet of ground on the south side of Pine street, and as near the middle between Front and Second streets, as conveniently may be, and the whole depth of my ground, *there to build a meeting-house upon, if the members of that meeting shall agree to build a meeting-house there, but not else."* The residue of his estate he devised to his children in fee simple. Pur-

(96)

[Griffitts v. Cope.]

suant to these directions, a conveyance was made by the executors upon the trusts set forth in the will.

Samuel Powell, the father of Samuel Powell the younger, by his will, dated in 1752, after reciting the devise by his son as above stated, and that the monthly meeting had concluded to erect a meeting-house, covering the entire sixty feet devised to them, "whereby the same building or meeting-house, it is thought, will be much confined, and deprived of necessary air and light;" and that he would, if in his power, have remedied the evil by adding two side lots, each twenty feet in width. He therefore enjoined upon his grand children, the devisees of Samuel Powell the younger, to convey these lots; and annexed a condition to the provision made for them in his will, that they should, within thirty days after they respectively came of age, convey these adjoining lots to certain persons "and their heirs, in trust for the aforesaid people called Quakers, at Philadelphia, for ever, for such use and service as the members of the monthly meeting aforesaid shall order or direct, or unto such other persons and their heirs as the monthly meeting aforesaid shall nominate, in trust and for such use and service as aforesaid for ever, and to no other use, intent, or purpose whatsoever."

Pursuant to these directions, the children of Samuel Powell the younger conveyed the two side lots to the nominees of the monthly meeting and their heirs, "to the use of them, &c., or to such other use or uses, intents or purposes, as the said monthly meeting shall direct and appoint."

Prior to this conveyance the monthly meeting had accepted the devise and erected the meeting-house, which was completed in 1753.

The plaintiffs in this action were the heirs of the children and devisees of Samuel Powell the younger, and claimed to recover because the trust or charity had been abandoned by the donees.

It was proved that in 1832 another meeting-house had been erected in Orange street, by the monthly meeting, at which place the meetings were subsequently held, with the exception of a weekly meeting held in Pine street, during a part of the year. This was discontinued in 1835, under a resolution of the monthly meeting, since which time the meeting-house had not been used for any purpose. The cellars were rented out for storage, and the windows of the building had been boarded up.

In 1836, the meeting-house and lot were offered for sale and sold by the monthly meeting. The contract not having been perfected, it was again sold in 1841, but the purchaser refused to take because of a defect in the title.

His honor, ROGERS, J., directed a verdict for the plaintiffs, reserving the right to the court in banc to modify the judgment or

[Griffitts *v.* Cope.]

to enter a judgment for plaintiffs or defendants, for the whole or part of the premises in dispute.

The case was argued at December Term, 1850, by *Tyson* and *Williams*, for the appellants, and by *McMurtrie*, with whom was *Ellis Lewis*, for the plaintiffs below; and at this term by the same counsel for the appellants, and by *McMurtrie* and *Gerhard*, with whom was *Lewis*, for the plaintiffs below.—The devise was not of a conditional estate; it merely imposed a condition precedent to the conveyance by the executors, which, when executed, made the devisees purchasers for value.  As to the side lots, no question can arise; for the grantors, whether they were or were not bound to do so, have conveyed a fee simple untrammelled by any condition or trust.  The main lot is held as a charitable use: 2 *S. & St.* 67; *Duke* 374; or if not so, as a trust not on condition: *Cro. Eliz.* 288; *Duke on Ch. Uses* 80; *Poph.* 6; *Moore* 594; *Com. Dig. Condition,* A. 4; *Vin. Ab. Devise,* F. E.  As the one or the other, neither the misuser of the property nor any abuse by the trustees can work a forfeiture.  But this is a case merely of non-user.  For there has been no destruction of the property nor sale of the building.

For the plaintiffs below it was argued:—That the question is what *quantity* of estate was given by the founder of the charity. A gift for a particular purpose implies that no greater estate is given than is necessary for the purpose.  Thus a devise in fee, if intended only for payment of debts becomes a base fee ceasing on payment of debts: 1 *Bla.* 645.  So of a grant to a corporation: 6 *Ser. & R.* 234; and similar instances in *Vin. Ab. Esch.* A. 3, n. C. 8; *Cro. Eliz.* 669; *Vin. Ab. Estate* I. 7, 7; T. 5, 2; *Estate b. a.* 9; *Escheat F.* 2.  Reservation for a dwelling; a sale by the beneficiary destroys his estate: 9 *Barr* 52.  For the use and service of a mill is a base fee: 5 *Ib.* 126.  Such would have been the rule in England but from the disregard of the doctrine of resulting uses in cases of charities: *Amb.* 190; 2 *J. & Walk.* 307.  The present is clearly a resulting use: 1 *V. & B.* 272.  In this country the same construction is given to instruments creating charities as other estates: 10 *Pick.* 185; 11 *Ib.* 495; 16 *Mass.* 496.  To say the testator did not intend the property to be continued in the use for which it was given, would be dangerous doctrine to charitable uses.  The legal intent is clear if we suppose a contest in the meeting as to the continuance or diversion from the trust, referred to this court.  That the beneficiaries may abandon such a charity cannot be doubted.  For the persons entitled are those only who can claim lawfully through this organization.  For all purposes the individuals as beneficiaries are represented by the monthly meeting.  If the court would carry on the trust at the instance of individuals against the will of the meeting, a schism

[Griffitts *v.* Cope.]

is inevitable, and the trust violated.   It is conceded there must be
an acceptance to give an estate, and that can only be on the very
conditions imposed: 3 *Meriv.* 353; 1 *W. & Ser.* 9; *Cas. T. F.*
222; 1 *Dev. Eq.* 276.   The right to reject after acceptance must
exist in the same parties unless there be a contract created by the
acceptance capable of being enforced by the court.   And being
thus rejected for the uses for which given, the estate commensurate
with the uses fails: 5 *Pick.* 528; 8 *Metc.* 238; 1 *Dev. Eq.* 276;
3 *Barr* 436.   Wright *v.* Linn, 9 *Barr*, which overruled Kirk *v.*
King, is a proof of our position.   The rejection there was by
trustees not competent to bind the beneficiaries.   The fact of a
determination no longer to use the building as a place of worship
is not denied; and as the court cannot carry on the charity against
the will of the society, the estate has ceased, and that of the
grantor revives.

The opinion of the court was delivered by
Lowrie, J.—There is a very palpable distinction between a gift
of land from motives of charity, and a dedication of land to chari-
table uses; and there are most intrusive reasons giving a judicial
bias in favor of satisfying the motive without establishing a per-
petual dedication.

Our law discourages the fettering of estates and putting them
into mortmain, and therefore favors the construction which relieves
from restraints upon alienation.   And it seems unreasonable to
suppose, that a devisor ever means that his heirs shall get back
the land in such cases, except when he says so; or that, amidst
the rapidly changing opinions of society, he means that his
opinions shall be imbibed by others just as he left them, and shall
for ever withstand the changes necessarily incident to the progress
of society; or that he means that no change in the number, cir-
cumstances, and habits of the people, shall ever justify any sort
of conversion of the gift.

It would seem contrary to public policy to favor a construc-
tion that would give to a man, who died a hundred or a thousand
years ago, the control of land that ought to be controlled by the pre-
sent generation.  Such an intention ought to be expressed, not implied.

When we look at the varied institutions of the last few centuries,
and at the constant and rapid changes which are going on in the
circumstances, habits, opinions, and institutions of our own age, we
see how unreasonable are many perpetual dedications of land, and
how much caution there should be in implying an intention to
create perpetuities.

These principles being borne in mind, we are in the proper posi-
tion for taking the best view of the devises in controversy.

The construction which we put upon the devise in the will of
Samuel Powell, Jr., not only rules the title to the other two lots

[Griffitts *v.* Cope.]

in controversy here, but excludes us from the consideration of many of the legal propositions discussed by the counsel.

Striking out the machinery by which this devise is to be effectuated, we discover that the substance of it may be stated as follows : If the Quaker meeting shall agree in good faith to accept the lot on Pine street, for the purpose of building a meeting-house upon it, then I devise the same to them and their successors. Both the language of the devise and the influence of the Act of 1731, for enabling religious societies to hold land, constrain us to consider this lot as given and accepted for a place of religious worship.

The main question of this cause may then be stated thus : Where there is a devise of land in fee to a religious society to build a meeting-house upon, is it implied, as one of the terms of the devise, that the donees shall not use it except for a place of meeting, and that they shall never sell it though they should convert the proceeds to the same religious uses ? Does a conversion amount to a diversion ?

Let it be remarked, that a conveyance of land to a religious society implies a religious use, and that, by our Act of 1731, a religious society could hold to no other use. For obvious reasons almost all grants to religious societies are for meeting-houses; this purpose being necessarily implied, if not expressed.

All religious societies hold land for a qualified purpose, because the law does not allow them to hold for general purposes. But this qualification has place only as between the public and the holders, and not between the grantors and the holders. It is not a qualification of the estate as granted, but of the uses to which, in such hands, it may lawfully be applied. It is not intended to prevent alienation to general purposes, but to prevent a religious society from using land for general purposes. It defines a duty of religious societies to the state, not to their grantors.

The use to which the granting clause declares that this land is to be applied is of the character which the law requires, and is the most ordinary purpose for which religious societies require land. The presumption would therefore appear fair and obvious, that, by that declaration, the devisor merely meant to make the grant lawful upon its face.

This construction fully satisfies all parts of the devise. The devisor uses words of fee simple; and the other words, that truly describe all such estates in such hands, cannot be construed to reduce a fee simple to a qualified fee. To produce this effect it is necessary that other words be added, showing clearly that the testator intended that the land should revert on the abandonment of the particular use.

These grants are, as between the grantor and grantees, fees simple, and as between the trustees and beneficiaries they are

[Griffitts *v.* Cope.]

trusts.   If they are held in violation of the mortmain laws, the state may claim to forfeit them; but the grantors and their heirs have no title.

After we had consulted and agreed upon this opinion thus far, our brothers GIBSON and COULTER referred us to a similar case just published in 15 *Pa. St. Rep.* 500, Kerlin *v.* Campbell.    The grant there was to a public use, and the legislature, which has the control of such uses, directed the sale of the land.    If there had been a reversion there, even legislative authority could not have divested the right.    True, there was a consideration paid in that case; but that fact is only evidence that no reversion was intended.

Let the judgment be reversed, and let judgment be entered in favor of the defendants.

Judge COULTER dissented not as to the question of reversion, but as to the right of alienation.