Canovaro et al., Appellants, *v.* Brothers of The
Order of Hermits of St. Augustine.

Argued December 2, 1936.  Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Clarence E. Blackburn,* with him *Harry M. Klingsberg,* for appellants.

*Daniel C. Donoghue,* for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, March 22, 1937:

The Parish of the Church of Our Lady of Good Counsel, sometimes known as the Church of Our Mother of Good Counsel, was created in Philadelphia in 1889 by and under the authority of the Roman Catholic Church. It had fixed lines and its communicants generally were of Italian origin. The Brothers of the Order of St. Augustine purchased some land in the parish, the legal title being taken in the name of the Order. A church with a rectory was erected on a portion of it under the auspices and in accordance with the ritual of the Roman Catholic Church and was used exclusively for Roman Catholic services under Roman Catholic rules, regulations and canons. A parochial school was also established for Roman Catholic educational purposes under the Franciscan Sisters. The funds to build and pay for the church and school were derived in part from contributions, donations and collections from the parishioners and others. At the time of this action there was outstanding a mortgage of $60,000 against the property, secured by the bond of the Order of St. Augustine.

The parish was the seat of a branch of the Order of St. Augustine, having therein a monastery. This Order, under the Ordinary or Archbishop, took charge of the church, supplying it with a pastor approved by the Ordinary and teachers for the schools free from any control whatever by the communicants of the church, who were the lay members of the Church of Our Lady of Good Counsel. The parish was instituted, in spirit at least, as a parish for Italian people. The church was located close to two other Catholic churches, St. Paul's and St. Nicholas of Tolentino, and on May 5, 1933, the Ordinary, who is the Archbishop of the Diocese of Philadelphia, deeming the church building not in keeping with the standard fixed by the Roman Catholic Church in size and structure, and for canonical reasons, issued a decree dismembering the parish. At the same time the Ordinary petitioned the Vatican to approve the removal of the Seat of the Order of St. Augustine to another parish, that of St. Nicholas of Tolentino. This act received the approval of the Pope and was recognized by the Superior General of the Order of St. Augustine, who resides in Rome. The dismembered parts of the parish were merged with St. Paul's parish, which has a much more beautiful church, only two blocks away, and with other adjoining parishes. According to the laws of the church all parochial property in the dismembered parish, including the church and school with the land on which they were erected, though held in the name of the Order, was the property of the Roman Catholic Church under the control and disposition of the Ordinary.

Rev. Dr. Hickey, Assistant General of the Order, appearing for defendant, testified that the Order recognized the validity of the dismemberment decree by the Ordinary and stated that, under the canon law of the church, it caused the church and rectory property, held in the name of the Order, to come under the control and disposition of the Ordinary for the religious and charitable uses to which it had been dedicated. While the

dismemberment decree was being carried into effect, the plaintiffs, members of the Church of Our Lady of Good Counsel, protested against such action and appealed to Pope Pius XI at Rome. They dispatched a cable asking him to intervene and restore the status quo. An appeal was also made to the Apostolic Delegate at Washington. The action of Cardinal Dougherty, dismembering the parish, was sustained by the Pope, and the objectors were called upon to obey the Cardinal's decree made in the exercise of the rights and authority conferred upon him by the canons of the church.

Plaintiffs, as members of the Church of Our Lady of Good Counsel, but claiming to be an unincorporated association independent of the Roman Catholic Church, then filed this bill in equity, alleging the Church and school properties were impressed with a trust to be used as an Italian church and school, and that the title was taken in defendant Order's name upon that understanding and agreement. They averred that the Order was no longer in sympathy with the purposes and objectives for which the school and church properties were purchased and maintained, and was about to convey the real estate to third parties in direct violation of the trust agreements. They asked the court below to place the property under the control of the lay members, "its rightful owners," to enjoin defendant Order from conveying, selling, encumbering or transferring the premises, to decree that the property should be held by the defendant Order in trust for the plaintiff lay members for the purposes for which it was given, and to direct the Order to convey the premises to the lay trustees in accordance with these purposes. Complete answers were filed. The court below, after a full hearing, dismissed the bill, and this appeal followed.

The court below held that as the plaintiffs were no longer members of the dismembered parish they had no standing to assert any rights in the property, and to grant the requested relief would be inequitable, since it

would divert the property from the use for which it had been dedicated.

At the hearing appellants endeavored unsuccessfully to show by parol evidence that they, as a separate organization, made an agreement or entered into an understanding with the Order of St. Augustine whereby the property was to be held perpetually by the Order for the religious and educational purposes of the Italian people of the parish, and that their association was independent of the Roman Catholic Diocese of Philadelphia, but under the jurisdiction of the Order of St. Augustine. Even if this parol evidence had been admitted [see Act of April 22, 1856, P. L. 532, Section 4], and had been sufficient in quantity and quality, it would have placed appellants just as securely under the governance of the Roman Catholic Church as if they were a secular church in the parish. Appellee Order is altogether a Roman Catholic organization subject to the control and discipline of that Church. Any church controlled or held by it, is under the jurisdiction of the church through the Ordinary, and such property used for church or school purposes is subject to the Roman Catholic canons, unless, perhaps, the trust purposes are embodied in a writing which provides otherwise.

But, as the record shows, no such independent association ever existed in this parish. On the contrary, it appears that the religious services and the administration of the parochial property were at all times under the control and jurisdiction of the Roman Catholic Church. These church uses existed from the date of the church's erection in 1889 to 1933, when dismemberment occurred. The members were exclusively of the Roman Catholic faith.

Under the canons of the church there can be no such thing as a separate and independent church organization within the Roman Catholic Church, whereby property may be acquired and held in opposition to its laws, canons, rules and regulations, and at the same time be

subject to its supervision and control. To create such a status would require special authority from the church itself. There must be evidence that the Order with which the supposed agreement was made had power to enter into such an agreement hostile to church laws and that the church itself accepted the agreement. Any church organization claiming the protection, benefits and assistance of the Roman Catholic faith and laws directly, or through one of its bodies, such as the defendant Order, is and must be subservient to its laws, canons, rules and regulations. It cannot in one breath claim life from the church, and the benefit of the faith that it follows with the protection granted under its laws, and, in the next breath deny its allegiance to the body under which it serves. Its very practices deny such conclusion. Nor can it, in opposition to church laws, set up a trust in property acquired through church contributions, donations and gifts, unless it was specifically reserved in writing. The impulse or motive of the donors in giving was the spirit and love of the church generally, to promote the Catholic faith under its protection, not because of any so-called independent association or any of the members who composed it. It was given for the purpose of advancing the worship of God according to the faith and discipline of the Roman Catholic Church and for no other purpose.

Appellants' counsel, realizing the great burden his clients assumed to establish an independent association, in his argument before us planted his rights on a different basis and argued that the provisions of the Act of April 26, 1855, P. L. 328, Section 7, covered his case. By so doing, he acknowledged his clients to be communicants and members of the Roman Catholic faith. Taking up the case from this viewpoint, appellants earnestly contend that the decree of the court below removed control of the church property from the lay members in contravention of the Act of 1855.

There can be no question that under the Act of 1855 church property was held subject to the control and disposition of lay members, but it could not be diverted from the purposes, uses and trusts imposed through its dedication for religious purposes. The fulfillment of the trust was to be accomplished under the rules, regulations and laws of the church as governing and controlling.[1] The act expressed the settled policy of the State, with respect to the tenure of property held by religious societies, existent for years and steadily observed without question: *Krauczunas v. Hoban*, 221 Pa. 213, 225. The amendatory Act of May 20, 1913, P. L. 442, was construed in *Zernosky v. Kluchinsky*, 278 Pa. 99, 104, to be no more than a clarification of the accepted meaning of the Act of 1855. But this right of control and disposition of church property was in the lay members by virtue of their membership, and only by those having that status could any right be claimed. In *St. Casimir's Polish R. C. Church's Case*, 273 Pa. 494, we said at page 499: "We know of no legislation which gives to a member of a congregation a property right in his membership therein. His rights in the church property flow from his membership . . . church property belongs to the congregation of the church. The difficulty here is that appellants are no longer members of the congregation." If persons who claim to exercise the right of control and disposition are not members, either because of excommunication or otherwise (*Merman v. St. Mary's G. C. Ch.*, 317 Pa. 33), or have changed their membership to a church in another parish, or a change of parish lines has caused them to become members of another

---

[1] *Maceirinas v. Chesna*, 299 Pa. 70; *Zernosky v. Kluchinsky*, 278 Pa. 99; *St. Joseph's Li. Roman Catholic Ch. Pet.*, 270 Pa. 73; *Davidsville F. Nat. Bk. v. St. John's C.*, 296 Pa. 467; *Krauczunas v. Hoban*, 221 Pa. 213; *Carrick v. Canevin*, 55 Pa. Superior Ct. 233; see also *St. Mary's Im. Con. Gr. Cath. C. Petition*, 296 Pa. 307; *Dochkus v. Lithuanian B. Society*, 206 Pa. 25; *Watson v. Jones*, 13 Wallace 679; *Novickas v. Krauczunas*, 240 Pa. 248.

church (*St. Casimir's Polish R. C. Church's Case,* supra), they do not retain any right, nor do they have any voice, in the control or disposition of the property of the church of which they were once members. Dismemberment of the parish of Our Lady of Good Counsel worked this result.

Inasmuch as the church in which appellants claim membership is a subordinate body of the Roman Catholic Church, it follows that their rights and obligations as members are governed by the laws of that denomination, since the voluntary act of joining the church subjects them to its rules and regulations: *Krecker v. Shirey,* 163 Pa. 534, 551; *Zernosky v. Kluchinsky,* supra. The Roman Catholic canons and the decisions of the appropriate tribunals and officials of the church are decisive of the issues here raised, unless in contravention of the law of the land: *St. Casimir's Polish R. C. Church's Case,* supra, at pp. 498, 499; *Furmanski v. Iwanowski,* 265 Pa. 1, 5, 6; *Krecker v. Shirey,* supra, at p. 551.

The canons empower the Ordinaries to divide or dismember parishes when canonical reasons exist, notwithstanding the unwillingness of the rectors and members. The finding of the court below, that the Ordinary in dismembering the parish acted in accordance with the authority vested in him by the canons, is amply supported by evidence. Furthermore, the validity of the decree is not disputed by appellee Order, and, on appeal to the Pope, was upheld by him. Under the church law the effect of dismemberment was to cause the parish to cease to exist and to transfer its members to adjoining parishes. There were no longer any members of the original parish. The order of dismemberment was binding on the parish members. Division, dismemberment or suppression of parishes, and the effect thereof on membership are purely ecclesiastical matters, dependent upon the church law as administered by the appropriate authorities and tribunals. See *St. Casimir's Polish R. C. Church's Case,* supra, at p. 501. The effect of the dis-

memberment of the parish and the transfer of appellants' membership therefrom to other parishes was to deprive them of all rights as members in the church property of the parish from which they were transferred. Church membership is an ecclesiastical matter, not temporal. There is no property right in membership, and there could be no property rights in lay members except through their membership in the congregation.

Appellants' statement that "by a mere fiat the parish in which the church . . . is located could be extinguished," brings up the question of what would become of this particular church property. We have pointed out in this opinion that in so far as the dismemberment proceedings were concerned they were regular and in conformity to its rules and regulations, having been approved by the highest authority. The inference that the property could be sold by the Ordinary of the Diocese without using the proceeds for religious and educational purposes is negatived by the record, which shows that the Ordinary will make an equitable and just division of the property among the parishes with which the dismembered parish was merged. The Catholic canons provide for the disposition of the property of a dismembered parish by the Ordinary in aid of the purposes to which it has been dedicated. This is in accord with the provisions of the Acts of 1855 and 1935. Canons 1500 and 1501 regulating the disposition of property of dismembered and suppressed parishes and providing for "safeguarding always the wishes of those who made the donations or gifts" must be construed in the light of the purposes actuating the gifts unrestrained in any manner by the donors. The property under no circumstances becomes the property of any individual who may be empowered to divide it under the canons, but must be used in furtherance of the religious purposes for which it was donated.

It is earnestly contended by appellants that the Ordinary, in dismembering the parish entirely, did by indi-

rection that which the Act of 1855 intended should not be done directly, as his decree of dismemberment left no members of the Church of Our Lady of Good Counsel with a voice in the future control and disposition of the church property. The sole factual distinction between this case and the *St. Casimir* case is that in the latter the parish was not completely extinguished, only part of its membership being transferred to another parish by the change in the boundary line. In the instant case the parish has been entirely dismembered, and, as a result, it not only has no members but no longer exists as a parish. In reply to the contention that the purpose of dismemberment was merely to avoid the Act of 1855, we point out that there is nothing in the record to justify the inference that the underlying motive was to divest lay members of control of church property in circumvention of the statute. We cannot view either the cause of dismemberment or its effect other than in the light of the action of the church authorities as found by the chancellor. The decree of dismemberment was a proper exercise of the authority vested in the Archbishop by the Roman Catholic rules and made in pursuance of just and canonical reasons. The actuating reasons for dismemberment, as testified to by Bishop O'Hara, were proper for the consideration of the Archbishop, and were amply sufficient to justify action within the canons of the church. The decision of the proper ecclesiastical tribunals in this respect must be accepted by the civil courts unless it violates the civil law or is plainly in disregard of the church canons, even though it touches directly upon property rights which fall within the jurisdiction of civil courts. "When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide. But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them": *Watson v. Jones,* 13 Wall. 679, 730.

Under the controlling church law, therefore, appellants are no longer members of the parish in which they seek to control the property and are without standing to maintain a bill in equity to enforce such property rights. However, it is not necessary to base our decision on this ground and to hold definitely that lay control can be entirely suppressed indirectly by the dismemberment of a parish for canonical reasons. Whatever merit there may be to appellants' argument is vitiated by the Act of June 20, 1935, P. L. 353, Section 1, which is amendatory of Section 7 of the Act of 1855, and materially and substantially changes the law concerning the control of church property.

Turning to the Act of 1935, the extent and effect of the change brought about by it is immediately made clear when its provisions are contrasted with the Acts of 1855 and 1913 preceding it. The Act of 1855 vested in the church laity absolute control and disposition of church property subject to the uses for which it was lawfully dedicated. The Act of 1935 provides that whenever any property has heretofore been or shall hereafter be conveyed for the use of any church, congregation or religious society or in trust for religious worship or sepulture, it shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation or religious society having a controlling power according to the rules of such church, congregation or religious society, "which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation or religious society shall belong." The Act is comprehensive enough to include all property, real or personal, of churches, congregations or religious societies acquired by gift, purchase, grant or devise.

The long established and deeply imbedded policy of entrusting the ultimate power of control and disposition

of church property to the laity subject to the uses for which it was dedicated was uprooted by the Act of 1935. Its provision prohibiting the diversion of property from the purposes or trusts for which it was lawfully dedicated is similar to that of the Act of 1855, and by its express terms it applies to all property acquired by churches either prior or subsequent to its enactment. The effect of this statute is to make supreme the internal rules, regulations and usages of religious societies respecting the control of their property. The civil law no longer requires control to vest in lay members, but permits each individual church or society to determine for itself in what authorities this power shall vest. Property control, as well as all other ecclesiastical matters, is now governed by church law, since the impediment imposed thereto by the civil law has been removed. Churches are now no longer differentiated from other voluntary organizations in this respect. The Act of 1935 recognizes the binding effect of the internal laws of religious societies regarding the power of control and disposition of church property.

Does the Act of 1935 because of its retrospective character take property without due process of law, and divest church lay members of vested property rights? The fact that it is retrospective in itself does not render it unconstitutional: *Adle v. Sherwood,* 3 Wharton 481. We there said: "A retrospective law, which does not impair the obligation of a contract, nor is in its nature ex post facto, is constitutional." See also *Palairet's Appeal,* 67 Pa. 479, 485. But if a legislative act operates to divest a vested right by virtue of its retrospective effect, it amounts to a taking of property without due process of law, unless it is a valid exercise of some fundamental power, as the police power, taxing power, or power of eminent domain: White, Constitution of Pennsylvania (1907), p. 117. The legislature cannot arbitrarily interfere with or destroy private property rights:

*Norman v. Heist,* 5 W. & S. 171; *Wolford v. Morgenthal,* 91 Pa. 30.

A consideration of the constitutionality of this act requires a study of the character of the interest which lay members had in church property prior to 1935, so that it may be determined whether they had such a property right as entitles them to protection under the constitution.

Prior to the Act of 1855 property held or acquired by a voluntary association as a religious sect, denomination or congregation to be used for religious worship or education, governed by the doctrines of any particular church, faith or denomination, was subject to the control and disposition of the congregation according to the church rules and regulations. The control vested in the lay members. It had long been a settled rule in Pennsylvania where land is conveyed for the use of a religious society, even though the conveyance be in trust, that the transfer operates to vest absolute legal title in the congregation, subject to the limitation that the property may not be diverted from the uses for which it had been lawfully dedicated. This rule was predicated on the Act of February 6, 1731, 1 Sm. L. 192, Sec. 2, which conferred upon religious societies the legal capacity to hold land. In *Brendle v. The German Reformed Congregation,* 33 Pa. 415, where land was conveyed to trustees, in trust for the use of a religious congregation, it was held that the congregation took a complete fee simple title. We said at pp. 424, 425: "That act [of 1731] gave to religious societies legal capacity to hold, and therefore the conveyance to their trustees constituted an executed legal estate in the congregation itself . . . the title in their name is treated as the title of the congregation, to be used by the congregation at their discretion, for such purposes as the law allows. . . . What then is the efficacy of the declaration that the congregation holds the land for the use of its poor, for a church, and for a burial ground? Nothing, except to show that they hold it for the purposes for which the

law allows congregations to hold land. Not to limit their own title, but to recognize the uses allowed by law." See also *Griffitts v. Cope,* 17 Pa. 96, 100; *Brown v. Lutheran Church,* 23 Pa. 495, 499. The congregation had complete control over the land and could alienate it, with the important limitation on their powers that they must use it or the proceeds from its sale for those purposes for which it was dedicated. This was the law with respect to the interest of lay members in church property at the time of the passage of the Act of 1855, which amounted to no more than a codification of the then existing rule and continued in force the policy of this State with regard to the ownership of property by religious organizations. In *Maceirinas v. Chesna,* 299 Pa. 70, we said at p. 73: "The policy of the State, with respect to the ownership of property by religious organizations is embodied in the Act of April 26, 1855, P. L. 328, which, to remedy the situation that existed in relation to property in the hands of ecclesiastical bodies, to clarify the law and to give expression to the then prevalent thought, lodged the *absolute ownership* of property in the lay members of the church, subject to and impressed with the uses to which it was dedicated. That ownership carried with it the right to receive and control, for the purposes dedicated, the revenues, rents, issues and profits derived from the church property: *Ryan v. Dunzilla,* 239 Pa. 486, 491; *Mazaika v. Krauczunas,* 229 Pa. 47, 53. It also included the right to possession and use of church property other than that necessarily and intimately related to and connected with church worship *(Zernosky v. Kluchinsky,* 278 Pa. 99), and the latter may be subject to the control of the laity if the preservation, maintenance or reconstruction of the church is involved."

The question arises as to what is meant by the expressions "fee simple," "absolute ownership," "grant to the society itself," "title," and others of a similar nature, which appear throughout the cases in describing the in-

terest of the congregation in church property. Do they mean that the lay members took the property free of all restraints? Obviously not, since such interpretation would lose sight of the fact that they are limited in the use of the property to the purposes for which it was dedicated. All the acts, including that of 1935, prohibit "the diversion of any property from the purposes, uses and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter be lawfully dedicated. . . ." It is quite apparent that in effect the lay members held title merely as trustees in a limited sense and were vested with the power of control and disposition of the church property solely in that capacity. A particular church of a given faith or sect as a local congregation is a part of the larger religious faith or sect which comprises the entire church or denomination. The local or parish church cannot divorce or separate itself from the mother church, set up a new independent organization and by so doing retain the ownership of the local church or congregational property: *Dochkus v. Lithuanian B. Society,* supra, at p. 29. In no event can the members utilize the property in a manner foreign to the principles, customs and rules of the church to which it has been conveyed, even though a majority or the entire congregation express their approval of such action: *Krecker v. Shirey,* supra. Neither can it, or a majority of its members, sever its connection or separate itself from the ecclesiastical body by and through which it was endowed with faculties, which enabled it to organize as part of the church family in subordination to the given authority of the church, and its laws, and retain any property rights. While the ownership of church property vested in a particular congregation, its use was dedicated to the church generally, not specifically to a local congregation with the power to sell it and divide the proceeds among themselves. The lay members held title subject to the uses, purposes and benefits for which it was given, acquired or devised. In

this respect it was subject to the church laws, canons and regulations. Furthermore when a religious society becomes inactive or extinct, its property is not subject to division among its members and does not revert to the original grantors. See Act of May 17, 1921, P. L. 861, Section 1. A dissenting minority of one, or the intervention of the church generally can prevent any spoliation of such uses: *Nagle v. Miller,* 275 Pa. 157; *Kicinko v. Petruska,* 259 Pa. 1.

Consequently, nothing is clearer than the fact that the property interest of the lay members was in no sense absolute prior to 1935. They merely had the power of control and disposition over the property to be exercised in harmony with and in submission to the principles, rules and canons of their church. This did no more than clothe them with some of the attributes of trustees. The restricted use to which they could put the property negatives "absolute ownership" in them. This term has been used in a loose sense and is inextricably coupled with the prohibition against diversion of the property. Taken by itself it conveys an erroneous impression of the extent of the interest of the lay members in church property. In short, the effect of the Act of 1855 was purely to preserve to them their right to act as "trustees," and prevent any interference with this right by the church law. The policy of the law was to vest in the lay members, as "trustees," the power of control and disposition of the property, and nothing more.

Whatever property rights one had as a church member did not spring from any statute independent of membership, but existed only so long as he had that status under church laws. This clearly demonstrates that he had no civil right as an individual that appertained to the property of any particular church. As a member of such church he could protest to church authorities for acts done within the Church, and these appellants so proceeded. This right in church property arising from membership is not a personal asset; it cannot be in-

herited, sold or assigned; it cannot be liened, seized for debt, nor is it subject to any dower claim. Control and disposition by the lay members as "trustees," was required to conform to church laws. They could not assess pew rents where the laws of the church forbid it. They could not make a portal charge for the same reason. See *Zernosky v. Kluchinsky,* supra.

In view of the fact that the lay members were vested with an interest in the property essentially as trustees by the Act of 1855, it is necessary to determine whether their interest under that statute is a vested property right within the meaning of the Constitution. In a very early case, *Brown v. Hummel,* 6 Pa. 86, it was decided that where a trust was established by will for the education of poor orphan children and a method provided in the will for perpetuation of the trustees and the filling of vacancies, an act of the legislature changing the method of selection of the trustees divested them of the "rights, franchises and privileges" vested in them by the will without due process of law. The court placed great emphasis on the fact that the statute arbitrarily worked a material alteration in the settlor's will by taking the administration of the trust from those whom he expressly provided should act as trustees without apparent reason or any trial.[2] The court reached its

---

[2] The court said at pp. 93 and 94: "But the most important of all our franchises—the right of an elector and citizen—cannot, in a confined sense, be called property. It is not assets to pay debts, nor does it descend to the heir or administrator. But who does not feel its value; and who but would turn pale if he thought he could be deprived of it without hearing or trial, by an act of Assembly? The very object of the charter was that a private and eleemosynary bounty of the purest character should be in the legal custody of persons who were responsible to the laws, and who would be bound to administer it in good faith. They were constituted the legal guardians of the estate, and were entitled to certain franchises, of all which they were deprived, without summons, hearing, or judgment, and by an act of the legislature, which, with regard to them, was rather a sentence of condemnation, than a law. But George

decision on the theory, which seems doubtful, that the trust was strictly *private* in character and its administration had no public consequences. The rule laid down is that where trustees of a testamentary trust, active and private in nature, are appointed and hold office under the provisions of the will creating the trust, they have in effect a vested interest in the property, and their duties and powers in their capacity as trustees cannot be divested by the legislature. The legislature has no power to override a testamentary disposition of property, which does not violate any rule of law at the time it takes effect.

In the instant case an entirely different situation is presented. The trust res was acquired and used as a church and school in accordance with the faith and discipline of the Roman Catholic Church. In the all-inclusive use of the property, the trustees in "control and disposition" were required to conform strictly to the tenets and laws of the church, and their power of control was merely incidental to such use and of such slight consequence that it possessed very few attributes of trusteeship as that term is generally understood. The usual discretionary power of trustees over the res was almost entirely absent. There was nothing in the grants vesting any particular body or persons with the power of disposition and control. This power vested in the lay members solely by reason of the existing common or statutory law governing such conveyances at the time of their making. The Act of 1855, making them so-called trustees, did not give them such a vested interest as to preclude future legislation regulating the control of the property. The interest created by the Act of 1855 does not possess the character of a vested right within the Constitution. There is no tangible interest in the persons exercising the power. Their tenure of office was

---

Fry did not, by his will, constitute the legislature of the state of Pennsylvania to be the administrators or almoners of his bounty, nor the Synods of the Eastern and Western Lutheran Church, to appoint whom they pleased to that function."

not made permanent, but depended first on their status as members, at all times subject to church laws, and second upon the will of the legislature. A change in either sweeps the power to control and dispose from them. Furthermore a change in legislative policy divesting them of control would not run counter to the express provisions of a will, as in the *Brown* case, and constitute an arbitrary interference with the lawful, testamentary disposition of property. Nor would it interfere with a vested interest in view of the indefinite and unstable character of the right here described.

Furthermore it is fair to assume that where a gift is made to a religious society with knowledge that under an existing statute the property will be controlled by the congregation as "trustees," the donor intends that in the future the right of control is to be subject to the will of the legislature in the absence of the expression of any intent to the contrary. In this respect *Philadelphia v. Fox*, 64 Pa. 169, is helpful. That case involved certain charitable, testamentary trusts, among them the trusts created by Girard's Estate, appointing the City of Philadelphia as trustee. Subsequent to their creation a statute was passed vesting their administration in the "Board of Directors of City Trusts." The constitutionality of this statute was attacked on the ground that it deprived the municipality of its vested right to administer and control the trusts. This court, speaking through Justice SHARSWOOD, ruled it constitutional, holding that the trusts were created subject to the control of the legislature with full knowledge that the trustees were merely agents of the legislature acting under a revocable power, and that the city, as trustee of the charities, cannot set up a vested right to have the trust continued in the form in which it was created.[3]

---

[3] Justice SHARSWOOD said, at p. 182: "When, therefore, the donors or testators of these charitable funds granted or devised them in trust to the municipality, they must be held to have done so with the full knowledge that their trustee so selected was a mere

It has long been recognized that a religious and educational use is a charitable use. In *Price v. Maxwell*, 28 Pa. 23, this court stated, at p. 36: "A charitable use is not always a religious one, but we know of no religious use, which could be recognized at all as free from superstition, that is not included in the definition of a charitable use." Considered in this light, there can be no doubt of the right of the legislature to take measures which they deem necessary to the proper enforcement of the trust. In *Philadelphia v. Fox*, supra, at pp. 182 and 183, there is the following quotation from *Girard v. Phila.*, 7 Wallace 14: "'It cannot admit of a doubt,' says Mr. Justice GRIER, 'that where there is a valid devise to a corporation, in trust for charitable purposes, unaffected by any question as to its validity because of superstition, the sovereign may interfere to enforce the execution of the trusts, either by changing the administrator if the corporation be dissolved, or, if not, by modifying or enlarging its franchises, provided the trust be not perverted, and no wrong done to the beneficiaries.'" Therefore, for the above mentioned reasons, the Act of 1935 does not constitute a divestment of a vested right and applies with full force to all property acquired by religious societies either prior or subsequent to its enactment.

The order of the court below dismissing the bill is affirmed at appellants' cost.

---

creature of the state, an agent acting under a revocable power. Substantially they trusted the good faith of the sovereign. It is plain—too plain, indeed, for argument—that the corporation by accepting such trusts, could not thereby invest itself with any immunity from legislative action. Such an act would not change its essential nature. It is surely not competent for a mere municipal organization, which is made a trustee of a charity, to set up a vested right in that character to maintain such organization in the form in which it existed when the trust was created, and thereby prevent the state from changing it as the public interests may require. . . ."