## Datz v. Dougherty et al.

*Robert T. McCracken,* for plaintiff.
*John W. Kephart,* for defendants.

McDEVITT, P. J., February 25, 1941.—This is a bill in equity filed by Ruth T. Datz, the widow of John A. Datz, Sr., who departed this life in February 1939. She seeks to compel defendants to permit the removal of the bodies of her deceased husband and her first child from the burial ground known as Holy Sepulchre Cemetery, in Montgomery County, near this city, to Laurel Memorial Park Cemetery located in Egg Harbor Township, N. J.

John A. Datz, Jr., was interred in said cemetery in September 1918, in the burial lot of his grandfather, Alois S. Datz. Shortly thereafter another burial lot was purchased in the same cemetery in the same name, and after the death of Alois S. Datz a mausoleum was erected on the second lot in 1923, and the body of John A. Datz, Jr., removed thereto. In this same mausoleum was buried

the body of John A. Datz, Sr., in February 1939, and it has reposed there in peace and quiet until this present litigation, which was instituted in August 1940.

While it would appear at first glance that the only question before the court is the right of the surviving spouse to determine the burial place of her deceased husband, it must be borne in mind that the proposed action is in reality a disinterment in anticipation of a reinterment, and the removal of the remains of a man who died in good standing as a member of the Roman Catholic Church, from consecrated ground to a niche in a mausoleum in a nonsectarian burial park.

The facts of themselves necessarily bring into consideration, and most careful consideration, the control of the ecclesiastical laws of deceased's church over his last resting place, just as well as the determination of his spouse of his resting place in the first instance. Our entire line of cases, dealing with burials, leads back to the early English cases where the whole matter of burial was under the jurisdiction of the ecclesiastical courts, and was based on the theory that there was no property in a corpse. We, however, recognize that there is a legally constituted right of custody, control, and disposition, which are the essential attributes of ownership. While our law, it must be said, recognizes property in a corpse, it is such property as is subject to a trust and limited in its rights to such exercise as shall be in conformity with the duty out of which the rights arise. Whether the rights be called property or not is manifestly a question of words rather than substance.

Under the laws of this Commonwealth, the right to administration belongs first to the surviving husband or widow. To such survivor, therefore, belongs the right of control of the body for interment. The extent to which decedent's own wishes or even specific directions are to prevail, is a much mooted and unsettled question. While decedent's directions are not necessarily regarded as paramount, practically all the cases agree that they are

entitled to respectful consideration whenever the question comes into court.

There must be sanctity as well as solemnity connected with laying away the dead in their last resting place to await the resurrection day and this deserved peaceful sleep is not to be disturbed by the whim of relatives who if encouraged might change cemeteries as they do styles.

The law guarantees quiet and peaceable possession of a man's home during his lifetime. It is more important that the same power protect his peace and quiet after death and save him from profanation and disturbance when he has neither strength nor voice to combat invaders or intruders.

Plaintiff and the deceased were married in January 1917, and thereafter, so far as we know, and there is nothing to indicate anything to the contrary, lived happily until the departure of the deceased in February 1939, a period of 22 years and one month. They were married by the ceremony of the Roman Catholic Church under a dispensation granted by the then archbishop of the diocese, in consequence of an agreement, offered as defendants' exhibit number 8, in which plaintiff agreed that she would permit the full and free exercise by John A. Datz, Sr., of his religion, according to his belief, and that all children of either sex born of the union should be baptized and educated in the faith according to the teachings of the Roman Catholic Church. Of this union four children were born, one of whom died in infancy, John A. Datz, Jr., and whose remains rest in the same mausoleum with his father. The other three are still living and vary in ages from 10 to 21.

In pursuance of the antenuptial agreement with the church, the practice of plaintiff's husband's religion was continued until his death, at which time he received the last rites of his church and was subsequently buried in accordance with the burial ceremonies of the same church. Her children have likewise been raised as members of the Catholic Church, and so far as the record shows all three

are in good standing at the present time. Until this suit there had been a complete compliance with the terms of her agreement.

The faithful practice of a Catholic's religion includes his dying in good standing, and only under such circumstances can he be accorded a Christian burial in accordance with the ceremonies of this church. Burial in a place provided for the Catholic faithful departed is part of the burial ceremony, and all of this in pursuance of the antenuptial agreement was carried out, so far as the court is informed, without deviation until the beginning of this suit.

From the time of her son's burial in Holy Sepulchre Cemetery until the death of her husband, the family made regular visits to the child's grave. Some effort was made by plaintiff to show that John A. Datz, Sr., had expressed a desire to remove the remains of his deceased infant to a burial ground nearer Margate City, and one witness testified that 11 years before his death a Laurel Memorial Park salesman had discussed with John A. Datz, Sr., the purchase of a burial lot in Laurel Memorial Park Cemetery. This burial park has been in operation since January 1928. Thus for more than 11 years before the death of John A. Datz, Sr., he constantly passed the park on his trips to and from Philadelphia to visit the grave of his son, and even though his widow stated that he had commented upon it as being a very nice place to be buried, no act was ever performed by him in his lifetime that would indicate that was in his mind. On the contrary, he continued to go back and forth to Holy Sepulchre Cemetery adjacent to Philadelphia, where his child, his parents, and a sister were buried. It would seem logical that were the trip tiresome, as described by a witness, and were the resting place unsatisfactory or another preferred, he would have done something to remedy the situation during the 20 years his first-born rested in Holy Sepulchre Cemetery.

It is given to man once to die. We know not, however, when nor where. But it is inescapable and so we must

prepare for it. Facing the inevitable suggests certain preparations. If a burial place be ready it spares the survivors. At least we know such places are necessary and so we need not shudder at arranging them. After 20 years visiting Holy Sepulchre deceased must have known that a burial place was a necessity and as a successful businessman we have a right to assume that he considered he had made provision.

Plaintiff now contends that she wishes to remove the bodies of her husband and child to Egg Harbor Township, so that her entire family might be buried together. She is evidently reckoning without her host. She is assuming that her three children will never marry, which is contrary to the everyday practice. But if they do marry and have families of their own, or only wives in the case of the boys, and a husband in the case of the daughter, to say nothing of the possibility of children, they would either have to compete in dying early to enjoy the mausoleum, or bring about the same separation in burial places that she now complains of. From her own testimony she is only entitled to half of her father's mausoleum, or five burial crypts.

Much stress was laid upon the physical condition of plaintiff immediately following the death of her husband. The evidence is far from convincing that she was anything but the distraught wife that we see every day in respectable decent circles upon the occasion of the death of the head of a family. We would not expect to find among respectable people a jubilant widow, oblivious to the death of her husband and only anticipating a large inheritance or perhaps remarriage. This plaintiff showed none of the traits of the modern adventuress or fortune hunter. They don't usually tarry 22 years with one helpmate or bear four children. From the credible testimony it is apparent that she was grief-stricken, but far from irresponsible, inert, or inactive. Upon the death of her husband, which occurred in Florida, instead of succumbing to hysteria, plaintiff communicated by telephone with

an Atlantic City undertaker and solicited instructions for bringing the deceased's body to his home and last resting place.

While the Atlantic City funeral director would not state that plaintiff gave him specific instructions concerning the funeral arrangements, there is no evidence that anyone else did or that anyone else had authority to do so. Certainly it cannot be claimed that the influence of his Catholic relatives arranged the funeral services, because there is no evidence that any of them was consulted or present. And it was not a civil or patriotic ceremony that was completely turned over to strangers. It was an everyday respectable family funeral ceremony.

After her return from Florida to Margate City, plaintiff made an automobile trip to Philadelphia and, from a very large assortment, selected a casket for her husband's body. Before the exposure of his remains to public view, she inspected the work of the funeral directors and approved everything that had been done. The next day she accompanied the body to the church where the Roman Catholic ceremony was performed, and later accompanied the body to Holy Sepulchre Cemetery where the burial service of the same church was read by a properly ordained priest of said church, and his body sealed in the niche set apart for it in the family mausoleum. This conduct negatives the idea of either irresponsibility or trance. Plaintiff was perfectly conscious of everything that she was doing, and while there is no doubt that she was grief-stricken there is no evidence that she was unconscious. Those who sought to create the impression that her condition was such that she could not have been held accountable for anything she did under the circumstances all had dealings with her on the occasions of their visits that are contradictory to their conclusions. It seems most unusual that the funeral director who held the long-distance conversation and numerous other conversations with plaintiff proceeded with all the funeral arrangements without recalling who gave him the in-

structions. His was the only work that seemed to be done mechanically, in a trance or without direction. And still no detail was omitted. Briefly, the undertaker did not know who had the deed to the lot in Holy Sepulchre Cemetery, who gave him the directions for the burial service in said cemetery, or who gave him any other specific instructions, but he did know that he had no arrangements with anyone but plaintiff who, incidentally, paid all the bills, including the cost of removal of the slab from the niche in which her husband's remains were placed, and the resealing of the same slab in the said niche.

Plaintiff denied familiarity with the regulations under which Holy Sepulchre Cemetery is conducted and denied ever having seen them before their production in court. While she admits her silence so far as telling anyone that her husband's interment at the time was only a temporary one, she attempts to justify this with the statement that she did not think it was necessary to tell anyone. The record shows that from February 1939 until April 1940 she made regular visits to the burial place of her husband without complaint or suggestion of change. About that time there was some slight controversy between her and the authorities in charge of the cemetery relative to flowers or plants. She was then advised by the superintendent that she could not do something that she had done before, and the inference is capable of being drawn that this controversy was probably the inspiration for the proposed change.

It was about the same time that what is known as the Taubel-Datz Mausoleum was purchased for the sum of $12,000, and paid for by Mrs. Datz's father. It would seem to be a bit inconsistent for the widow plaintiff to permit her husband's body to remain undisturbed in one resting place for approximately fourteen months, and then by a strange coincidence decide to remove it, as well as her son's body which had lain undisturbed for 17 years, at the time her own father purchased another burial place. Had plaintiff desired to rest beside the remains of

John A. Datz, Sr., after death suitable arrangements could have been made in Holy Sepulchre Cemetery, in a Catholic cemetery at Hammonton, New Jersey, or even in Laurel Memorial if made before interment. The right of administrators in original interments is unquestioned, but after interment except under unusual conditions the right to disinter in order to reinter has been waived.

Stranger things than remarriages have occurred, and if a change of resting place were permitted under present circumstances, and the widow remarried at some later date, and then desired another change, such as has been evidenced in some of the authorities cited, there would be no end to removals of departed spouses or any guaranty of a permanent resting place for the dead. It is undoubtedly because of that danger and possibility that Mr. Chief Justice Mitchell laid down such definite rulings in Pettigrew v. Pettigrew, 207 Pa. 313, when he said that there should be a presumption against removal, and that there could be no universal rule applicable to all cases, but that each case must be considered in equity on its own merits with due regard for the interest of the public, the wishes of decedent, and the rights and feelings of those entitled to be heard by reason of relationship or association.

Both parties to this litigation seem to have cited the same authorities, and interpreted them to suit their own contentions. It would appear that the most applicable authority under all the circumstances is that of Brnilovich v. St. George Independent Serbian Orthodox Church of Pittsburgh, 326 Pa. 218, because it is the only case decided since the passage of the Act of June 20, 1935, P. L. 353.

As stated in the Brnilovich case, supra, at page 222:

"The right of control over cemeteries maintained by churches, like all other temporalities held by religious associations, is vested, under the law of this State, in those designated by the canons, regulations and customs of the church society. See Act of June 20, 1935, P. L. 353, Section 1; *Canovaro et al. v. Brothers of the Order*

*of Hermits of St. Augustine*, 326 Pa. 76; *Post et al. v. Dennis Cardinal Dougherty*, 326 Pa. 97."

The Act of 1935, supra, conclusively establishing the legal recognition of church control over ecclesiastical cemeteries, makes the following provision:

"Whensoever any property . . . *has heretofore been or* shall hereafter be bequeathed, devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church . . . for *or in trust for* . . . sepulture, . . . the same shall be taken and held subject to the control and disposition of *such officers or authorities* of such church . . . having a controlling power according to the rules, regulations, usages, or corporate requirements *of such church*, . . . which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, *denomination* or organization to which such church . . . shall belong."

Under the cases cited pursuant to that act there can be no dispute that church law is paramount in the control of cemeteries. The Brnilovich case is an apt illustration. There plaintiff was not a member of defendant, an incorporated church, although he was a member of the same faith. He sought the aid of the court to force the church cemetery to accept his daughter's body because it was a public cemetery which, under the law, was required to accept any and all persons. With the lower court's aid, the interment was forced upon defendant church. On appeal, however, the Supreme Court held this action unlawful, stating at page 221:

"Like all other church property, its control is governed by the rules and usages of the particular religious group. Lots in such cemeteries may only be acquired upon the conditions expressly or impliedly prescribed by the body of its laws."

The statement in the footnote at that page is even more appropriate. The court referred to a leading New York case in the following language:

"In *People v. Trustees*, 21 Hun (N. Y.) 184, at 193-194, it was said in regard to burial in a Catholic cemetery: 'Every applicant is presumed to know, that it is not an ordinary cemetery, incorporated and conducted for the purpose of general and indiscriminate burial, but a corporation attached to the Roman Catholic Church, with power to make lawful rules, regulations and by-laws. In fact, the cemetery is part of the temporalities of this great Church . . . Where a party applies for a burial plot, at the office of a distinctively Roman Catholic Cemetery, it is with the tacit understanding that he is either a Roman Catholic, and as such eligible to burial, or at least that he applies on behalf of those who are in communion with the church.' "

The Brnilovich case dealt with original interment rather than removal, but the same rule that burials are made in ecclesiastical cemeteries subject to the rules, regulations, canons, and discipline of the church, must be held to apply to removals as well. Although this proposition has not been submitted to an appellate court in this State, there is a well-reasoned and unappealed decision in Schmidt v. O'Brien et al., 6 Schuyl. Reg. 130, which so applied the law.

See Arnaldo v. Roman Catholic Bishop of Jaro et al., 280 U. S. 596.

In Pettigrew v. Pettigrew, supra, Mr. Chief Justice Mitchell thoroughly reviewed the authorities up to 1904, and certainly public policy, regard for the public health, and a universal sense of propriety, have not so changed that a body should no longer be decently cared for or definitely disposed of.

In Moore v. Sheafer et al., 282 Pa. 360, a surviving wife remarried and buried her second husband, and then sought to remove the remains of her first husband, apparently so she could be buried between her departed spouses. It was a matter purely for the exercise of judgment by the chancellor, and there was no question of religion or burial in a cemetery under church control as

opposed· to one open to all. Possibly plaintiff Moore in this case, being a sister of defendant's first husband, wanted to avoid the embarrassment of having a husband on either side of defendant Sheafer on the day of resurrection. Certainly the facts in this case are not analogous to the one at bar.

In Puckey v. Blake et al., 306 Pa. 374, plaintiff sought to remove the remains of his first wife and an infant son from his first wife's family's burial plot to a lot in another cemetery adjacent to a lot owned by his second wife, and in which his second wife's first husband was buried. The family of his first wife opposed the removal. In this case plaintiff's first wife was buried beside her father in accordance with her dying expressed wish and with plaintiff's consent. There her body had remained for a decade, and the chancellor felt that equity should not interfere to disturb the quiet and rest of the deceased. And as long as remarriages continue and survivors seek to assemble departed spouses, the dead are entitled to a protected peace.

In none of the authorities cited are the facts sufficiently similar to the one at bar to be of assistance.

In Schmidt v. O'Brien et al., 6 Schuyl. Reg. 130, the deceased had executed a written request for burial in a non-Catholic cemetery five days before his death, but immediately preceding his decease had received the last rites of the Catholic Church and, therefore, died as a member in good standing of that faith and was entitled to be buried in consecrated or blessed ground. Since his last act was· a contradiction or rescission of his written request, his wishes could best be interpreted by his unrescinded act. Likewise in this case, if the deceased, John A. Datz, Sr., had indicated at any time during his lifetime, and particularly during the 21 years that he visited his son's grave, that he was dissatisfied with Holy Sepulchre Cemetery as a burial ground, or that he contemplated purchasing a lot in another cemetery, he did nothing to carry out this thought and, dying as he did a member of

the Catholic Church, could have purchased a burial lot in a Catholic burial ground within 30 miles of his last home, wherein he and all the members of his family, including his non-Catholic wife, could have been buried together if it were his desire to rest closer to Margate City, N. J. Since Philadelphia was his original home, and since it is not an uncommon practice for persons to return to their homes, particularly from seashore resorts, as a last resting place, it cannot be gainsaid that that was not in his mind when he directed the erection of the mausoleum in which his remains now rest, after the death of his father, 16 years before his own demise.

For the reasons above set forth, the bill in equity must be dismissed.