ANDREW GALICH et al., Plaintiffs-Appellants, v. THE CATHOLIC BISHOP OF CHICAGO, Defendant-Appellee.

First District (5th Division)   No. 79-664

Opinion filed August 17, 1979.

Arthur J. O'Donnell and Sheila Murphy, both of O'Donnell & Murphy, of Chicago, for appellants.

Don H. Reuben, James A. Serritella, John J. Durso, and James A. Klenk, all of Reuben & Proctor, of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiffs brought this suit to enjoin defendant from closing and demolishing a certain church to which defendant holds the record title. The trial court found that it lacked subject matter jurisdiction and granted defendant's motion to dismiss plaintiffs' amended complaint. This appeal followed. On appeal, plaintiffs contend that (1) the trial court had jurisdiction over the instant case; (2) defendant holds the church property in trust; (3) an implied covenant requires the property to be used for church purposes; and (4) demolition of the church should be stayed until its pending landmark status is resolved. We affirm. The pertinent facts follow.

This controversy centers around Sacred Heart Church which is located at 11652 S. Church Street in Chicago. A brief examination of the church's history as set forth in the record is necessary to understand the parties' interests and rights in the property.

Sacred Heart Church was established in 1904 as a national parish to serve the French-speaking community on Chicago's far south side. The "church" was situated in several locations in its early days. In 1905, a parcel of land was deeded to the Catholic Bishop of Chicago for a stated consideration of $1. Shortly thereafter, the Sacred Heart Church and Shrine was built on the site. In 1961, an additional piece of property, now part of Sacred Heart, was conveyed to defendant by Father John F. McNally. Both deeds conveyed the property in fee simple with no express restrictions, conditions, limitations or other covenants. Over the years residents of the surrounding community donated their time, money and personal property for the upkeep and beautification of the church.

Because of the church's past, on July 22, 1978, an application was made to the Commission on Chicago Historical and Architectural Landmarks to have the church designated an historical landmark. On March 22, 1979, the church was designated a potential landmark and is presently under consideration for landmark status.

Following the retirement of the last appointed pastor, members of the community were assured that another pastor would be appointed. On January 22, 1979, after discussion with the Board of Archdiocesan Consultators, defendant announced the merger of Sacred Heart Church with other nearby parishes. The reasons given for the merger were the hazardous condition of the building and its need of costly repairs, and a shortage of priests to properly staff the facility.

A group of Roman Catholics who regularly attended and

worshipped at Sacred Heart Church formed the plaintiff committee and unsuccessfully sought to discuss the matter with defendant. Unable to contact defendant, plaintiffs brought this action for equitable relief.

In the amended complaint, plaintiffs alleged that an implied covenant exists on the property requiring its continued use for religious purposes. Plaintiffs prayed for (1) a permanent injunction preventing the demolition of the church or a temporary injunction until the church's landmark status is determined; (2) the imposition of a constructive trust over the church property for the benefit of plaintiffs so that it can be maintained as a church; (3) an accounting by defendant of all income from the church; (4) an order permitting plaintiffs to make necessary repairs and employ a priest subject to defendant's approval and at plaintiffs' expense in order to perpetuate the church; and (5) an order staying these proceedings until plaintiffs can be given notice and a full hearing by defendant.

Defendant moved to dismiss the amended complaint on the ground, among others, that a civil court is barred from overruling a decision of a hierarchical church. The trial court concluded that it had "no right to interfere in religious matters" and dismissed the amended complaint. Plaintiffs then brought this appeal. Defendant has agreed not to demolish the church until this court could decide this appeal.

OPINION

The threshold question for this court's determination is whether the first amendment as applied to the States through the fourteenth amendment precludes examination of the merits of plaintiffs' claim. In *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372, the Supreme Court made it clear that the role of a civil court in religious property disputes is severely restricted since the first amendment " 'commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.' [Citation.] This principle applies with equal force to church disputes over church polity and church administration." (426 U.S. 696, 710, 49 L. Ed. 2d 151, 163, 96 S. Ct. 2372, 2381.) The Supreme Court recently reaffirmed this position in *Jones v. Wolf* (1979), ___ U.S. ___, 61 L. Ed. 2d 775, 99 S. Ct. 3020. The Supreme Court stated that although courts are prohibited from resolving church property disputes on the basis of religious doctrine and practice, neutral principles of law could be used to determine the respective parties' rights. The majority expressed its view that by relying "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges" (___ U.S. ___, ___, 61 L. Ed. 2d 775, 777, 99 S. Ct. 3020, 3025) the neutral

principles approach "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." ___ U.S. ___, ___, 61 L. Ed. 2d 775, 777, 99 S. Ct. 3020, 3025.

Plaintiffs characterize the instant case as involving a question of their property rights in the church building. They contend that the dispute could be resolved by neutral principles of law and would not involve interpretation of religious doctrine or ecclesiastical issues. Defendant, on the other hand, asserts that the dispute is of a religious nature and not merely a property matter. The determination of the true nature of this action will decide whether this court can address the merits of the appeal.

I.

Plaintiffs first contend that defendant holds the property in trust for the benefit of plaintiffs, based on the theories of an implied trust and a trust created by virtue of defendant's status as a corporation sole and the application of the religious corporations act (Ill. Rev. Stat. 1977, ch. 32, pars. 164 through 188). Although the pleadings raised the issue of an implied trust, plaintiffs have not pursued this theory on appeal. Consequently, we will limit our consideration only to whether defendant stands as a trustee under the applicable statutes.

In maintaining that the religious corporations act (hereinafter "the Act") governs the instant case, plaintiffs rely specifically on sections 42 and 46j of the Act (Ill. Rev. Stat. 1977, ch. 32, pars. 171 and 185), which refer to corporations formed under the Act or under "any law of this state." While defendant has never incorporated under the voluntary provisions of the Act (Ill. Rev. Stat. 1977, ch. 32, pars. 164 and 173), plaintiffs urge that because defendant became a corporation sole pursuant to an act of the legislature (Private Laws of Illinois 1861, 22d General Assembly, at 78), he is governed by the Act. We do not agree.

■■ The Act makes it possible for a group organized for the purpose of religious worship to incorporate, thus taking on a legal identity and allowing it to hold title to property, a fact accomplished, with regard to defendant, by the enactment of 1861. The Act also places certain restrictions on religious corporations by defining and limiting the powers of the trustees and the corporations themselves. The 1861 act contains no provision for the creation of a board of trustees and vests title to all property in the corporation sole created by the act. The 1861 law further protects the Catholic Bishop of Chicago against the divestiture of any right to property acquired under the act. These differences between the two statutes clearly show that the 1861 law is an act of special legislation which prevails over the general provisions of the religious corporations act. (See, *e.g., People ex rel. Atwell Printing & Binding Co. v. Board of*

*Commissioners* (1931), 345 Ill. 172, 177 N.E. 705.) Accordingly, we conclude that no statutory trust has been created in the instant case.

■■ Plaintiffs contend, nonetheless, that the 1861 act is violative of the Illinois Constitution of 1870 which prohibits special legislation. (Ill. Const. 1870, art. IV, §22.) However, the 1870 Constitution invalidated only special charter corporations ·which were not organized when the constitution was adopted or within a 10-day grace period thereafter. (Ill. Const. 1870, art. XI, §2.) The Catholic Bishop of Chicago became a corporation sole in 1861, and the Illinois Supreme Court has held that such a special charter corporation, organized before the 1870 Constitution, is not invalidated by the constitution's provisions. (*Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11, 185 N.E. 170.) Moreover, defendant's status as a corporation sole was also preserved by the enactment of the 1970 Constitution. Ill. Const. 1970, art. XIII, §6.

■■ Plaintiffs also question in passing whether any rational basis for the special statutory classification exists. This question was long ago resolved in the case of *Johnson v. Joliet & Chicago R.R. Co.* (1859), 23 Ill. 202, 207, where, when faced with a challenge to a special statute on the grounds that the same purpose could be accomplished under general laws, the court stated:

> "It is too late now to make this objection, since, by the action of the General Assembly under this clause, special acts have been so long the order of the day, and the ruling passion with every legislature which has convened under the constitution, until their acts of this description fill a huge and misshapen volume, and important and valuable rights claimed under them. The clause has been wholly disregarded, and it would now produce far-spread ruin, to declare such acts unconstitutional and void. It is now safer, and more just to all parties, to declare, that it must be understood that in the opinion of the General Assembly, at the time of passing the special act, its objects could not be attained under the general law, and this, without any recital by way of preamble, as in the act to incorporate the Central Railroad Company. That preamble was placed there by the writer of this opinion, and a strict compliance with this clause of the constitution would have rendered it necessary in every subsequent act. But the legislature, in their wisdom, have thought differently, and have acted differently, until now our special legislation and its mischiefs are beyond recovery or remedy."

Plaintiffs' argument that defendant's status as a corporation sole violates the establishment and equal protection clauses of the United States Constitution (U.S. Const., amends. I and XIV) is without merit.

Contrary to plaintiffs' contention that the 1861 act treats defendant differently from other persons similarly situated, the 1861 act, as well as legislation enacted contemporaneously, acknowledges the differences between certain organized religions and attempts to provide a means through which such religions can conduct business matters. (See Private Laws of Illinois 1861, pp. 77 through 89.) Such legislation does not aid one religion at the expense of another.

■ We therefore conclude that defendant is not a trustee for the benefit of plaintiffs, and any property rights which plaintiffs may have must be based on other grounds.

## II.

Plaintiffs next contend that defendant holds the Sacred Heart property subject to an implied covenant. They argue that since the land was originally conveyed for use as a church and had been so maintained for a long period, an implied covenant arises for its continued use as a church. They rely on *Hale v. Finch* (1881), 104 U.S. 261, 26 L. Ed. 732, for the principle that express words are not necessary to charge a party with a covenant. However, the court in *Hale* also stated, "[A] covenant will not arise unless it can be collected from the whole instrument that there was an agreement, or promise, or engagement, upon the part of the person sought to be charged, for the performance or non-performance of some act." 104 U.S. 261, 269, 26 L. Ed. 732, 735.

■■■ The court found an express condition in *Hale* but refused to hold that this was an implied covenant. Generally, a covenant in a contract will only be implied when a court can clearly see that it was the intention of the parties, or when the covenant is necessarily implied to effectuate the purpose of the contract. (*Jobbins v. Gray* (1889), 34 Ill. App. 208.) Preliminary negotiations and agreements made prior to a conveyance of property merge into the conveyance itself. (*Department of Transportation v. Western National Bank* (1976), 63 Ill. 2d 179, 347 N.E.2d 161.) Where real property is conveyed in fee, courts will not enforce a restriction on its use by the grantee unless the intent to create such a limitation is clear. (*Patton v. Vining* (1958), 14 Ill. 2d 11, 150 N.E.2d 606.) The deeds which conveyed the land to defendant are absolute on their face and contain no express covenants regarding the use of the property. There is no indication of what the agreement or intent of the parties may have been. It is difficult to speculate that the deeds were given and accepted by the parties with the understanding that the land would always be used for church purposes. Changes in circumstances and needs over time must have been contemplated. If a covenant for continued use as a church were to be implied, defendant would be forced to maintain the building as a church until the parishioners agreed to a

closing. Absent any indication of an intent to create such a limitation, this court will not imply such a covenant. We therefore find that defendant holds the Sacred Heart property free from a covenant requiring continued church use of the property.

## III.

Plaintiffs next contend that the trial court should have issued a temporary restraining order to prevent the demolition of the church pending the determination of its possible landmark status. (Ill. Rev. Stat. 1977, ch. 24, pars. 11—48.2—1 through 11—48.2—7; Municipal Code of Chicago, ch. 21, pars. 62 through 64.2.) Defendant argues that plaintiffs may not enjoin him from destroying the building because of its possible landmark status, since neither the City of Chicago nor the Landmark Commission has that authority.

*People ex rel. Marbro Corp. v. Ramsey* (1960), 28 Ill. App. 2d 252, 171 N.E.2d 246, presents an analogous situation. There, a wrecking company had contracted with the owner of the Garrick Theatre Building for the demolition of the building. The wrecking company properly completed an application for a permit to wreck the building and submitted it for approval. Because the building had been previously designated a landmark, the City of Chicago sought to delay the issuance of the permit until steps could be taken to preserve the building. The wrecking company petitioned for a writ of mandamus to compel the issuance of the permit. The trial court denied the petition. The appellate court reversed and directed that judgment be entered for the wrecking company. Concerning the city's efforts, the court said:

> "It is laudable to attempt to preserve a landmark; however, it becomes unconscionable when an unwilling private party is required to bear the expense. The owners had decided that the preservation of the building was no longer feasible. All their previous efforts to retain the economic usefulness of the building had failed. It is undisputed that the theatre is functionally obsolete and that the building would continue to operate under a deficit even if large expenditures for renovation were made. The building is presently vacant and is a potential fire hazard. In the exercise of their business judgment and their clear legal right, the owners applied for a permit to demolish the structure." 28 Ill. App. 2d 252, 256.

The result in the *Ramsey* case has since been enacted into legislation in section 11—48.2—5 of the Illinois Municipal Code. (Ill. Rev. Stat. 1977, ch. 24, par. 11—48.2—5.) That section of the Code provides in pertinent part:

> "The denial of an application for a building demolition permit by

reason of the operation of this Division, * * * or the imposition of any regulation solely by reason of the provisions of this Division which requires, * * * any unusual or extraordinary provisions for upkeep and maintenance of any building, shall be deemed to constitute a taking or damage for a public use of such property for which just compensation shall be ascertained and paid."

In this case, defendant has determined that because of the hazardous condition of the building and the shortage of priests it was necessary to close the church and merge it with nearby parishes. To restrain defendant from exercising his legal rights concerning the building would amount to a taking or damage for a public use of his property for which he should be compensated. Even if the city were to acquire the property in order to preseve it as a landmark, plaintiffs' purpose would be unfulfilled. In their memorandum in response to defendant's motion to dismiss the amended complaint, plaintiffs admitted that, "Plaintiff's only interest lies in keeping Sacred Heart Shrine alive." Should the city acquire the site, it could no longer be used as a Catholic Church.

Since the demolition of the church should not be enjoined and plaintiffs' purpose could not be accomplished if the land is taken, the potential landmark designation should not prevent defendant from demolishing the building.

Concerning plaintiffs' property rights generally, the case of *Canovaro v. Brothers of Order of Hermits of St. Augustine* (1937), 326 Pa. 76, 191 A. 140, is instructive. There, the Supreme Court of Pennsylvania, upon nearly identical facts, decided:

"Under the church law the effect of dismemberment was to cause the parish to cease to exist and to transfer its members to adjoining parishes. There were no longer any members of the original parish. The order of dismemberment was binding on the parish members. Division, dismemberment, or suppression of parishes, and the effect thereof on membership are purely ecclesiastical matters, dependent upon the church law as administered by the appropriate authorities and tribunals. [Citation.] The effect of the dismemberment of the parish and the transfer of appellants' membership therefrom to other parishes was to deprive them of all rights as members in the church property of the parish from which they were transferred. Church membership is an ecclesiastical matter, not temporal. There is no property right in membership, and there could be no property rights in lay members except through their membership in the congregation." 326 Pa. 76, 84-85, 191 A. 140, 145.

IV.

Since plaintiffs have no protectible property rights in the church

building, the controversy centers around an ecclesiastical decision. In an affidavit attached to defendant's motion to dismiss, it is alleged that the Roman Catholic Church is hierarchical in nature, that the Archdiocese of Chicago shares the identical faith and doctrine with other Catholic churches throughout the world, and that all these churches look to the Pope in Rome as their ultimate earthly authority. In an unverified reply to the motion to dismiss, plaintiffs denied that defendant is a hierarchical church since the Second Vatican Council placed co-responsibility on the laity for church matters. Since the well-alleged facts contained in defendant's affidavit are not contradicted by counteraffidavit, they must be taken as true notwithstanding the existence of the contrary averments in the plaintiffs' reply pleading. (*Central Clearing, Inc. v. Omega Industries, Inc.* (1976), 42 Ill. App. 3d 1025, 356 N.E.2d 852; *Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 272 N.E.2d 497, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847; *Millsaps v. Bankers Life Co.* (1976), 35 Ill. App. 3d 735, 342 N.E.2d 329.) An hierarchical church is one which is "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." (*Kedroff v. Saint Nicholas Cathedral* (1952), 344 U.S. 94, 110, 97 L. Ed. 120, 133, 73 S. Ct. 143, 151.) Accordingly, for the purpose of the motion to dismiss, we conclude from the facts contained in defendant's affidavit that the Catholic Church is hierarchical in nature.

In sum, the action challenged by plaintiffs is defendant's decision not to assign another pastor to Sacred Heart and to instead provide services at other nearby parishes for those who had previously worshipped at Sacred Heart. Among the relevant factors considered in reaching this decision would be the cost of repairs, the utility of the building, and the availability of priests. These are questions of the allocation of resources and manpower to best serve the needs of the Catholic Community of the Archdiocese of Chicago. They are matters of church government and as such are ecclesiastical in nature. The fact that property is incidentally involved because it was needed to provide a place to worship does not change the basic nature of the action. The mere assertion of a property right is not sufficient to invest a civil court with jurisdiction over what is essentially a religious dispute. (*Eddy ex rel. Pfeifer v. Christian Science Board of Directors* (1978), 62 Ill. App. 3d 918, 379 N.E.2d 653.) It is a decision within the exclusive province of the Catholic Bishop of Chicago, subject only to the decision of the Pope, his superior. "Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 714, 49 L. Ed. 2d 151, 166, 96 S. Ct. 2372, 2382.

■■ The prayers for relief in the instant case clearly demonstrate the

religious character of the dispute. Plaintiffs sought to have a civil court impose a constructive trust to continue to maintain Sacred Heart as a church, to order that plaintiffs be able to employ their own priest, and to require defendant to give them adequate notice and a hearing on the dispute. They seek to have this court fashion some civil remedy and to place procedural strictures on defendant's decision making. In order to grant the requested relief, this court would be substituting its decision on the spiritual needs of the area for that of the bishop, and ordering him to maintain the church. In addition, the bishop is not required to provide adequate notice or a hearing before reaching a decision on a religious matter. As was noted in the *Serbian Eastern Orthodox* case, "Constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance." (426 U.S. 696, 715, 49 L. Ed. 2d 151, 166, 96 S. Ct. 2372, 2382.) The decision of defendant to close Sacred Heart Church is precisely the type of situation addressed in the *Serbian Eastern Orthodox* case as follows:

> " 'To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide * * * religious law [governing church polity] * * * would violate the First Amendment in much the same manner as civil determination of religious doctrine.' *Md. & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 369[, 24 L. Ed. 2d 582, 90 S. Ct. 499] (1970), (BRENNAN, J., concurring). For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. *Ibid.*" 426 U.S. 696, 709, 49 L. Ed. 2d 151, 162, 96 S. Ct. 2372, 2380.

Contrary to plaintiffs' contentions, we have determined that the instant appeal involves a question of church polity over which civil courts have no jurisdiction. The trial court's order dismissing plaintiffs' amended complaint is therefore affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.