SAVE IMMACULATA/DUNBLANE,
INC., et al., Appellants,

v.

IMMACULATA PREPARATORY
SCHOOL, INC., et al.,
Appellees.

No. 85–1061.

District of Columbia Court of Appeals.

Argued May 6, 1986.
Decided June 4, 1986.[1]

Richard A. Graham, Washington, D.C., for appellants.

John Vanderstar, Washington, D.C., for appellees.

Paul F. Interdonato, Washington, D.C., for amicus curiae, Most Reverend James A. Hickey, Roman Catholic Archbishop of Wash.

Before MACK and NEWMAN, Associate Judges, and PAIR, Senior Judge.

1. We affirmed the decision of the trial court in all respects by an unpublished judgment in this appeal dated June 4, 1986. This opinion issued August 25, 1986.

PAIR, Senior Judge:

The dispute culminating in this appeal centers on the recent closure of Immaculata Preparatory School and Dunblane Academy, private schools for young women located in the Tenley Circle area of Northwest Washington. Appellants, a group comprised of alumnae, the parents of several students, and Save Immaculata/Dunblane Inc., a nonprofit corporation formed in an effort to perpetuate the schools' existence, brought suit against appellees in the Superior Court in November 1984, shortly after the decision to close the schools was announced. ·Their complaint prayed for damages from appellees under various theories, including breach of contract and fraud, as well as equitable relief designed essentially to force the continued operation of the schools. From an order entering summary judgment in favor of appellees on all counts, appellants have appealed. We affirm.

I

The Sisters of Providence of St. Mary's of the Woods, Inc. (the "Order"), an appellee herein,[2] is an Indiana corporation affiliated with a Roman Catholic society of nuns of that name. The society itself was established in this country in 1840 at Saint Mary of the Woods, Indiana, and since that time has been devoted to its principal vocation of educating young women. To facilitate the management of its business concerns, the society in 1846 became incorporated under the laws of the State of Indiana. This corporate entity held, and continues to hold legal title to all of the society's real and personal property.

In 1905 the Order's mission, as it were, expanded to the Washington area with the founding of the Seminary of Our Lady Immaculate, the predecessor of Immaculata Preparatory School and Dunblane Academy. The Order had purchased property for this new school in an area called Ten-leytown, now the site of the successor schools. In 1906 the seminary was canonically recognized by the Roman Catholic Church as a school of what was then the Archdiocese of Baltimore. Not long after receiving this endorsement from the church, the Order formed a District of Columbia corporation, also bearing the society's name, by which it would operate the new school. Title to the property on which the seminary was situated, however, remained with the Order, the Indiana corporation.

During the seminary's infancy, enrollment developed such that the Order established separate academic programs for the elementary, high school, and junior college students attending. These programs became known eventually as Dunblane Hall, Immaculata Preparatory School, and Immaculata Junior College, respectively. Increased enrollment also necessitated the renovation of existing structures on the property as well as new construction, both of which were undertaken irregularly over several decades.

The Order's District of Columbia corporation operated the three schools until 1965. In that year, the Order formed distinct nonprofit corporations to run the schools, purportedly to take advantage of the District's 1962 Nonprofit Corporations Act. Hence, new corporations were created named Dunblane Hall (now Dunblane Academy) and Immaculata Preparatory School, and the Order's original District of Columbia corporation, The Sisters of Providence of St. Mary's of the Woods, was transformed into a corporation named Immaculata College of Washington. Like their predecessor corporation, the corporate purpose of each new entity, as stated in their Articles of Incorporation, was to maintain "exclusively for educational purposes an institution of learning in the District of Columbia." The articles of each corporation also provided that "[p]rovisions

2. The other appellees in this appeal are three District of Columbia corporations: Dunblane Academy, Immaculata Preparatory School, and

The Sisters of Providence of St. Mary's of the Woods, Inc. (formerly Immaculata College of Washington).

for distribution of assets on dissolution or final liquidation shall be in accordance with the provisions of law, said assets to be distributed for religious and educational purposes to The Sisters of Providence of Saint Mary's of the Woods, Indiana."

In 1978 Immaculata College of Washington closed its doors, largely because of declining enrollment. The lower schools, however, were viable through this time. Just a few years earlier, in fact, construction was completed on an addition to the building which housed Dunblane Academy. Up until their announced closure, Immaculata Preparatory School operated as a four-year high school and Dunblane operated as a middle school of grades five through eight.

The events leading to the school closings—and this litigation—actually began in the early 1970's. In 1972 the Order was warned by its financial consultant that it would have to soon convert its assets to cash in order to avoid insolvency. The Order was faced with rising operating expenses and debt payments associated with its several institutions, which it financed in part by drawing on its existing retirement reserve. Notwithstanding this, the retirement fund had been dissipating over the years as fewer young women entered the society and as more members reached retirement. Not only did this place a growing burden on the retirement reserve itself, but it diminished the Order's earning capabilities as needed to meet other expenses.

Consequently, in 1972 the Order decided that it would eventually close the schools and sell their properties to retire existing debts and to fund its retirement needs. In 1978, when it had become imminent that the Immaculata and Dunblane properties would be sold, and the schools disbanded, the Order initiated talks for their purchase with officials of the Archdiocese of Washington. Negotiations with the Archdiocese proved unsuccessful, however, and the Order then approached The American University which, at the time, was leasing property on the Immaculata-Dunblane campus.

Informal negotiations between the Order and American University for the sale of the Immaculata-Dunblane properties began in March 1982. In July 1983, the negotiations yielded what has been characterized as a "letter of intent." This letter of agreement, as it has also been called, appears to have been a conditional offer by the university to purchase the properties. However, the letter was not contractual in nature, as even the terms of payment had not then been confirmed. In any event, it was agreed that the parties would maintain the confidentiality of the agreement.

The schools continued to operate as usual despite the ongoing negotiations between the Order and American University and the existence of the tentative sale agreement. Accordingly, new students were accepted in the spring of 1983 and the spring of 1984 for matriculation in the school years which followed in September.[3]

Immaculata and Dunblane students began the 1984–85 school year in early September 1984. On or about October 2, 1984, approximately three weeks after the com-

<hr>

3. Jumping ahead somewhat, this is the essence of appellants' fraudulent misrepresentation cause of action against appellees. Appellants maintain that appellees' conduct constituted intentional deception in the sense that the schools' officials, knowing of the impending sale of the properties to the university and concomitant closing of the schools, nevertheless led incoming students to believe they were entering a four-year educational program either at Immaculata or Dunblane. Appellees deny this, asserting that the schools accepted new students partly because the sale was uncertain at the time. Appellees note in this regard that not only was the "letter of intent" conditional, but that church authorities had yet to approve the sale. Under canon law, religious institutions like the Order must obtain the permission of both the Archbishop of the Archdiocese and the Holy See in Rome before alienating property valued in excess of $1,000,000. It was not until May 1984 when the Order sought support from the Archbishop of Washington for its request to sell its properties. The Archbishop thereafter supported the Order's request and forwarded it to Rome. The Order received the Holy See's approval to sell its properties on July 24, 1984.

mencement of the school year, the Order announced that the schools would be closed in 1986, that the property would then be sold to American University, and that the proceeds of the sale would be placed in the Order's retirement reserve. According to the announcement, the then-current Senior and Junior classes at Immaculata would be able to graduate on schedule, but most Sophomores and all Freshmen would have to leave in June 1985. Comparable arrangements were made for the elementary school students attending Dunblane.

Responding to the announced closure, concerned students and parents met with school officials in an effort to persuade them to keep the schools open. On November 9, 1984, after this and other avenues proved unsuccessful, appellants filed suit in the Superior Court on behalf of themselves and "others similarly situated," naming the Order and the school corporations as defendants in the action. Appellants' complaint charged, *inter alia,* that the sale of the school properties would be *ultra vires* and in violation of express trusts and trusts implied by operation of law. On these counts, appellants alleged that, consistent with the corporate purpose of the District of Columbia school corporations, the students had a legally cognizable beneficial or trust interest in the schools and their properties, although not legal or record title. They contended that the sale of the properties and diversion of the proceeds from the sale to the retirement fund of the Order would violate these beneficial trust interests as well as the purpose clause of the school corporations, both to the detriment of educational opportunities for young women in the Washington area.

Appellants also alleged in their complaint that appellees knowingly deceived students, their parents, and benefactors concerning the schools' viability and the existence of the American University agreement. See note 3, *supra.* As a result,

appellants maintain they were caused to believe the schools would continue to operate at least through the graduation of the Classes of 1988. Further, it was alleged that appellants relied upon appellees' misrepresentations to their financial, educational, and emotional detriment by, for example, selecting Immaculata and Dunblane to the exclusion of other schools. On these allegations, appellants brought actions in fraud, contract, and violation of consumer protection laws.

In its answer to the complaint, appellees denied most of appellants' essential allegations including that there were trusts on the properties which benefited others, that incoming students were each promised a four-year curriculum, and that students detrimentally relied upon their words, actions, or omissions. Appellees affirmatively maintained, as they do here, that the Order had record title to the properties involved and, inasmuch as the dispute concerned the alienation of property subject to Roman Catholic canon law, civil courts were powerless to interfere with the intended disposition.

Appellants moved for class certification in February 1985. Appellees opposed class certification and moved for summary judgment in March 1985. Oral argument on their motion for summary judgment was heard on July 1, 1985. From the bench, the trial court granted summary judgment in favor of appellees on all counts and dismissed the complaint. This appeal followed.

II

Appellants first contend that "the trial court erred in rejecting the trust-based nonprofit corporation principle that property held by a charitable corporation must be held and used solely in accordance with its corporate purpose and no other." [4] Appellees counter that "a civil court is without jurisdiction to impose upon the property of

4. Appellants argue obscurely that "the trial court erred by conducting a trial by affidavit upon materials which were not of evidentiary substance and in the absence of adequate discovery." This contention is without merit.

the Sisters of Providence, a religious society, any kind of implied trust that is inconsistent with the title of record and the decisions of the church regarding the use of church property." This argument, which is also advanced by *amicus curiae*, the Most Reverend James A. Hickey, Roman Catholic Archbishop of Washington, is premised on the notion that all property belonging to a religious society like the Order is "church property" and its disposition therefore is regulated solely by Roman Catholic canon law. In this regard, appellees submit that a church decision respecting its properties, such as was made here by the Order with subsequent approval by the Archbishop of Washington and the Holy See, *"must* be respected by a civil court;" otherwise, it is alleged, the civil court would become embroiled in the internal affairs of the church in violation of the First Amendment.

This position is alluring at first glance given such decisions as *Galich v. Catholic Bishop of Chicago,* 75 Ill.App.3d 538, 546–48, 31 Ill.Dec. 370, 375–76, 394 N.E.2d 572, 578–79 (1979), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1277, 63 L.Ed.2d 600 (1980), and *Parent v. Roman Catholic Bishop of Portland,* 436 A.2d 888 (Me.1981), in which courts have rejected parishioner claims to church properties under implied trust theories, or variations thereof, as not cognizable in a civil court. The Supreme Court, however, has clearly stated the governing doctrine in this area:

[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values

are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *School District of Township of Abington, Pa. v. Schempp,* 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969); *see also Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). In our view, the dispute here may be resolved by application of "neutral principles of law." In other words, we need not entangle ourselves in ecclesiastical matters to decide this case under the trust theories advanced by appellants. This is so because appellants look to familiar corporate and trust principles of law for relief; they do not ask, and we need not decide, questions of church doctrine, polity, or administration. *See Jones v. Wolf, supra,* 443 U.S. at 603, 99 S.Ct. at 3025; *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 370, 90

S.Ct. 499, 501, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring).

We disagree, however, that appellants are entitled to any relief under the various trust theories they advance. The crux of appellants' argument is that although the Order had legal title to the school properties, the beneficial or equitable interest was vested in students and benefactors through the school corporations, which is consistent with the corporations' charitable status. Appellants maintain they "have a cognizable beneficial property interest because the school corporations either own or have a claim of equitable title to virtually all school property held or used in operation of the schools, including real property." They contend, therefore, that the Order could not lawfully divert the proceeds from the sale of these properties for use in financing its retirement fund. In this respect, appellants look to the separate and distinct District of Columbia school corporations, which operated for a singular corporate purpose, *i.e.*, the education of young women in the metropolitan area. On this point, appellants assert that the trial court erred in not concluding that all property, once committed to a distinct charitable purpose (education), is irrevocably committed to that purpose. Appellants add that under D.C. Code § 29–549(3) (1981), the assets of the dissolved school corporations should have been directed to benefit a similar non-profit corporation or entity with a like resolve.

On these bases, appellants would have this court impose on the Immaculata-Dunblane properties an implied or constructive trust, or resulting trust as seen in *Edwards v. Woods*, 385 A.2d 780 (D.C.1978). For this relief, appellants point to the fact that while the Order had record title to the properties, the school corporations in fact reimbursed the Order for initial expenditures in founding the schools, and since then have financed on their own the erection of building improvements. Moreover, appellants note that their beneficial interest in the properties is evidenced by their and others' donations to the schools which, they contend, were made solely with educational purposes in mind.

We need not detain ourselves long with these contentions. First, the Order is admittedly the record owner of the school properties, and appellants have pointed to no express trust created to divest the Order of either beneficial or legal interest in the properties. Secondly, appellants have cited no authority, and we find none, which would support the imposition of an implied or constructive trust in their favor on the school properties. Indeed, to hold that such a trust was intended would belie the Order's expressed desire, seen in the school corporations' articles, to have the corporate assets revert to it upon dissolution. Finally, as to the claim that a resulting trust was created, we note that this type of trust "is a property relationship designed to effectuate the parties' intent when one party takes title to property for which another has furnished the consideration." *Edwards v. Woods, supra*, 385 A.2d at 783 (citations omitted). Suffice it to say that appellants have failed to present evidence creating any factual issue on this point, particularly given their burden of demonstrating by clear and convincing evidence that there was an arrangement of this nature contemplating beneficial ownership by the school corporations of the Orders' school properties. *See id.* at 784 (citations omitted); *Haliday v. Haliday*, 56 App.D.C. 179, 182, 11 F.2d 565, 568 (1926).

■ In short, we conclude that the trial court properly held, as a matter of law, that appellants could not prevail on their various trust claims.[5] And we reach this conclusion having viewed the pleadings,

---

5. We are unpersuaded that the provisions of § 29–549(3) afford appellants any relief. The Order's designation of itself as the recipient of the school corporations' assets upon dissolution is sanctioned by § 29–549(2).

Also, we seriously question appellants' standing to challenge the Order's decision on the basis of it being an *ultra vires* corporate act. *See* D.C.Code §§ 29–506, 29–813 (1981).

depositions, and other papers on file in the light most favorable to appellants, giving them the benefit of all reasonable inferences. *See, e.g., Dilbeck v. Murphy,* 502 A.2d 466, 468–69 (D.C.1985); *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

## III

Appellants' remaining claims are founded in contract, fraud, and unlawful trade practices. Appellants contend that there are material issues of fact pertaining to these causes and therefore appellees were not entitled to judgment as a matter of law. We disagree.

The underlying basis of appellants' action in contract is stated in their brief to this court as follows:

> Appellees offered a position by letter to each student accepted in either the "Class of 1987" or the "Class of 1988." These were understood by the parents to whom they were sent as commitments to the full four-year educational curriculum. Certainly such a reading was not unreasonable in view of the nature of the admission process, the custom and history of the schools and their offerings, and the inability to transfer to other schools of choice after the ninth grade. Further, such language must be construed against the writer, here the schools, not appellants. *Intercounty Construction Corporation v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982); 4 Williston on Contracts § 621 (3d ed. 1961); Restatement (Second) of Contracts § 236(d) (1932). This constitutes substantial, indeed overwhelming evidence that the parents accepted the offers of positions and sent their acceptance deposits to appellees as requested in reliance upon the understanding and with the factual expectation that an offer of a four-year education or curriculum had been made to them. At the very least, they did so based upon appellees' implied representa-

tion that no present plan to close the schools prior to 1988 was extant.

■ On appellants' contractual claim, then, the issue before the trial court was whether the parties intended that appellees would be bound to provide a four-year curriculum to incoming Immaculata and Dunblane students. *See Georgetown Entertainment Corporation v. District of Columbia,* 496 A.2d 587, 590 (D.C.1985) (citing *Edmund J. Flynn Company v. LaVay,* 431 A.2d 543, 546–47 (D.C.1981)). Plainly, the relationship between the schools and its students in this case was contractual in nature. *See Basch v. George Washington University,* 370 A.2d 1364, 1366 (D.C.1977). We conclude, however, that the trial court correctly held that as a matter of law the term of the individual contracts was for a single year. We reject appellants' argument that appellees were committed to provide four years of education simply because incoming students were offered positions in the "Class of 1987 [or 1988]." There is also no merit whatsoever to their contention that consideration for a four-year education was "furnished in the form of the detrimental reliance by the students to the exclusion of other schools that offered and honestly contemplated indefinite existence." Summary judgment on this issue was properly entered by the trial court.

■ Appellants' claim of fraudulent misrepresentation is also without merit. An action for fraudulent misrepresentation, of course, will not lie absent evidence that there was (1) a false representation or willful omission of a material fact, (2) knowledge of the falsity, (3) an intention to induce reliance, and (4) action taken in reliance on the representation. *Howard v. Riggs National Bank,* 432 A.2d 701, 706 (D.C.1981) (citing, among others, *Jacobs v. District Unemployment Compensation Board,* 382 A.2d 282, 286 and n. 4 (D.C. 1978)). Appellants' asserted factual predicate for this claim is that appellees, by withholding news of the impending closure of the schools and sale of the properties to

American University, intentionally deceived students and their parents into believing the students would get a four-year education. See note 3, *supra.* This was done, appellants maintain, because prompt disclosure of such information would have precipitated a decline in enrollment, and because of the Order's past experiences in dealing with parents when it closed its schools.

We see no basis here for an action for fraudulent misrepresentation. It is undisputed that the Order did not receive final approval for the sale of the school properties from church authorities until July 1984, several months after it had accepted students for the upcoming school year. It is also undisputed that the Order's agreement with American University had several contingencies and had not been finalized as of the beginning of the 1984 school year. Moreover, even if we were to conclude that appellees knowingly misrepresented the schools' status with an intention to induce reliance, there was no action taken by the students or their parents in reliance on the representation other than payment for education which was actually received. We hold, therefore, that as a matter of law, appellants could not have established the requisite elements of fraud. The trial court properly disposed of this claim by summary judgment.

Finally, appellants raise a claim of unlawful trade practices under the District of Columbia Consumer Protection Procedures Act (CPPA), D.C.Code § 28–3901 *et seq.* (1981 & Supp.1985). In *Howard v. Riggs National Bank, supra,* this court recently examined the Consumer Protection Procedures Act and observed:

> We agree ... that the CPPA, at least insofar as it is enforceable at the administrative level, was designed to police trade practices arising only out of consumer-merchant relationships. The Act clearly contemplates complaints against "merchants" who "supply the goods or services which are or would be the subject matter of a trade practice." CPPA

§ 2(a)(3) [D.C.Code § 28–3901(a)(3)]. While a "merchant" is not limited to the actual seller of the goods or services complained of, he must be a "person" connected with the "supply" side of a consumer transaction.

432 A.2d at 709. For appellants to recover under the Act, then, it must be established that appellees acted in the capacity of "merchants" in operating the Immaculata and Dunblane schools. *Id.* Their claim fails on this point because clearly a nonprofit educational institution is not a "merchant" within the context of the Consumer Protection Procedures Act. *See Board of Regents of the University of Wisconsin System v. Mussallem,* 94 Wisc.2d 657, 668, 289 N.W.2d 801, 807 (1980) (footnote omitted). We hold therefore that summary judgment in favor of appellees on this claim was also proper.

*Affirmed.*