Scott and Connie **BRADY**,
Plaintiffs–Appellants,

v.

Kris **PACE**, Paul Braschler, and Greg Mathis, Defendants–Respondents.

No. 25121.

Missouri Court of Appeals,
Southern District,
Division Two.

April 3, 2003.

Application for Transfer Denied
April 18, 2003.

Randy S. Anglen, Branson, Jeff Merrell, Forsyth, for appellants.

Bryan T. Renfrow, Springfield, for respondents.

KENNETH W. SHRUM, Judge.

In this libel suit, the Defendants are church pastors who wrote a letter to their church's congregation announcing their decision to remove Scott Brady ("Scott") from church membership. Upon a jury trial, the letter was found libelous, and Scott and his wife ("Connie") were awarded actual and punitive damages.[1] The trial court set aside the resultant judgment because the court concluded it lacked subject matter jurisdiction over the case. Plaintiffs appealed. This court dismisses the appeal with directions.

### FACTS

The Defendants were pastors of the White River Valley Community Church ("the Church"), a non-profit religious corporation. On February 16, 2000, Defendants sent a letter to Scott in which they voiced concerns regarding Scott's actions in the Church and expressed their desire to resolve any issues Plaintiffs might have about the church. In part, this letter read: "Not only does it not seem that you are aiming for harmony, it appears that you have your sights set on discord."[2] (Emphasis supplied.) The letter invited Plaintiffs to meet with Defendants and The Church's "Pastoral Accountability Team (PAT)" on February 26, 2000, and "express [Plaintiffs'] views." The letter cautioned, however, that if Plaintiffs did not attend the meeting, it would be obvious "that the desired restoration is impossible[ ]" and "according to Article Five, Section VI, Number 4 of our Church By–Laws, we will

---

1. When referring to Scott and Connie collectively, we call them "Plaintiffs."

2. Ultimately, Plaintiffs alleged this quoted language was libelous, but the jury found otherwise. That decision is left unchallenged on appeal.

follow through the final steps of Matthew 18:15–17." At the bottom of the letter, Defendants included language indicating a copy of the letter was being sent to nine PAT members and six other pastors.

After the February 26 meeting was held, Defendants sent a two-page letter to the Church's members concerning Scott. In part, this second letter read:

> "One of the men in our fellowship has found cause to disagree with the leadership of our church. Scott Brady has expressed his concerns to us in many discussions over a period of two years. We as Pastors have listened ... and responded with our point of view. *In his efforts to effect his desired change, Scott has contacted many others in the church, creating dissension and disunity. We have asked repeatedly that he stop sowing discord.* The word of God is very plain on the damage this can do in a fellowship." (Emphasis supplied.)

After giving an account of Defendants' efforts to resolve the conflict by following church procedure and biblical directives, Defendants' letter advised their efforts had failed and "[a]t this point something must be done." Next, the letter quoted biblical scripture, and then, the communication advised that "[i]n keeping with Matthew 18:15–17 and with the unanimous opinion of our Accountability Team, we as Pastors are removing Scott from ... membership of our church." The letter continued as follows:

> "There are some allegations being made that we must put to rest. The Pastors wrote a letter to Scott on February 19. We had already discussed this problem we were facing with a couple of highly respected Pastors, to seek counsel from their experience in this difficult situation. At the bottom of the letter to Scott, we included names of Pastors we intended to contact and send a copy of the letter, as well as the PAT. After the letter was sent, we made a decision not to contact these men. Scott contacted each of these Pastors and asked them about the letter, which of course they had not received. The reality is that we chose not to contact them after the letter was sent. This was not good judgment on our part, for which we apologize, but hardly dishonest as has been suggested. Each of the Pastors has been contacted since and the matter settled. *Second, no Pastor or representative of our church has filed any legal charges against Scott.* Third, we have offered the steps of restoration to Scott." (Emphasis supplied.)

The letter concluded with lengthy suggestions to the congregation regarding what it might do to build and unify the church, including prayer "for Scott and his family."

Thereafter, Plaintiffs sued Defendants and alleged, *inter alia*, that the italicized portions of the second letter libeled and damaged them. A four-day trial resulted in a jury verdict for Plaintiffs. The jury awarded Scott $25,000 actual and $4,500 punitive damages. It awarded Connie $10,000 actual damages.

On May 30, 2002, the trial court entered judgment in accordance with the jury's verdict. Afterward, the trial court, acting on Defendants' timely filed post-trial motions, set aside the judgment and entered judgment for Defendants. The court found it "was without jurisdiction to hear this cause as provided in *State ex rel. Gaydos v. Blaeuer,* [81 S.W.3d 186 (Mo. App.2002)] and *Schoenhals v. Mains,* 504 N.W.2d 233 (Minn.App.1993)." This appeal by Plaintiffs followed.

## DISCUSSION AND DECISION

In their first point, Plaintiffs maintain the trial court erred in sustaining Defendants' post-trial motion because the jury

found Defendants committed an "intentional tort and under Missouri law, State Courts have jurisdiction over intentional torts regardless of whether or not they happened within a church context[.]" Primarily, Plaintiffs rely on *Gibson v. Brewer,* 952 S.W.2d 239 (Mo.banc 1997), and *Weaver v. African Methodist Episcopal Church,* 54 S.W.3d 575 (Mo.App.2001), to support this argument.

In their second point, Plaintiffs assert the trial court erred in relying on *Gaydos* and *Schoenhals,* to conclude it lacked subject matter jurisdiction over this case. They insist that factual distinctions render *Gaydos* and *Schoenhals* inapposite as authority to support the action taken by the trial judge.

Because the two arguments substantially overlap, we consider them together. In doing so, we first consider *Gaydos.* There a bishop, a parish priest, and a nun in the Jefferson City diocese of the Roman Catholic Church ("Relators") sought a writ of prohibition from the western district to prohibit a circuit judge from trying an underlying multiple-count defamation suit brought by Diana Witthaus against Relators and the diocese. Witthaus alleged she had formerly been employed as an elementary principal at a Catholic school within the diocese. She further alleged the named defendants had defamed her by remarks implying she "was having a sexual affair with Father Ed Doyle[,]" suggesting Father Doyle had influenced her job performance, and generally imputing to her a lack of fitness to serve as school principal or that she was guilty of misconduct in her calling. *Gaydos,* 81 S.W.3d at 189–90.

After Relators and the diocese failed in gaining summary judgment, Relators filed a writ case. Relators' writ petition alleged the trial judge lacked subject matter jurisdiction over Witthaus's defamation claims because such claims were based on re-

marks allegedly made by Relators "in their official capacities as church officers dealing with church business." *Id.* at 190. Continuing, Relators asserted

"that the Free Exercise Clause of the First Amendment to the United States Constitution prohibit[s] the exercise of jurisdiction by a secular court over these claims because the adjudication of such claims by a secular court necessarily submits the practice of their religion to the judgment of others outside their religion, thus interfering with the free exercise of their religion."

*Id.* The western district ultimately made the writ absolute as to all but one of Witthaus's claims. *Id.* at 198.

In doing so, *Gaydos* initially noted the "First Amendment ... provides two sentinels for the protection of religious autonomy—the Establishment Clause and the Free Exercise Clause[.]" *Id.* at 190. *Gaydos* then examined both the historical background to the Amendment and case law that dealt generally with First Amendment preclusion of civil court involvement in religious matters. From this analysis, the *Gaydos* court concluded that civil courts lack "jurisdiction over disputes which are either essentially religious in nature or are sufficiently intertwined with church polity as to constitute a threat of entanglement with religious doctrine or practice." *Id.* at 192[5]. On the other hand, *Gaydos* noted exceptions to this general rule exist, e.g., "the First Amendment does not preclude court intervention in disputes between co-religionists when the issue is *purely* one of whether a religiously neutral civil law ... is presented." *Id.* at 192[2].

Next, the *Gaydos* opinion analyzed defamation cases that dealt with First Amendment issues regarding subject matter jurisdiction. In doing so, the *Gaydos* court noted, *inter alia,* the First Amendment

bars a defamation suit in civil court when a pastor's allegedly defamatory remarks are made in connection with termination of a parishioner's church membership, *see, e.g., Schoenhals,* 504 N.W.2d 233, but not when the pastor's accusations have "no relationship to the discipline of a [church] staff member, a church officer, or even a church member." *Gaydos,* 81 S.W.3d at 195–96.

Applying these principles, the *Gaydos* court found most of the allegedly defamatory statements about Witthaus (1) related to the non-renewal of her teaching contract; (2) were made during the time of the controversy concerning non-renewal; (3) were made to people associated with the church and school; and (4) as a practical matter, could not be separated from the non-renewal of her teaching contract. *Id.* at 197–98. Consequently, *Gaydos* ruled that the First Amendment obligated it to defer to the Catholic Church's own resolution of the termination issue and precluded it from considering Witthaus's defamation claims because (with one exception), they were inextricably intertwined with the termination question.[3] *Id.*

The other case cited by the trial court, *Schoenhals,* 504 N.W.2d 233, arose after a church pastor authored and published a letter to the congregation explaining why the church was terminating the plaintiffs' membership in the church. Specifically, the letter accused the plaintiffs of "lack of financial stewardship[,]" "[a] desire ... to consistently create division, animosity and strife in the fellowship[,]" and "[d]irect fabrication of lies with the intent to hurt the reputation and ... establishment of [the church]." *Id.* at 234. The letter continued, "[b]ackbiting, railing accusations, division, lying are some of the most serious sins found in the Bible. Where, by all

appearances ..., you have fallen into all of the categories." *Id.*

The plaintiffs' three-count lawsuit (fraud, defamation, and breach of contract) against the church and its pastor was decided adversely to them via summary judgment. In affirming the judgment, the appellate court reasoned:

"Since examination of the trust of [the pastor's] statements would require an impermissible inquiry into Church doctrine and discipline, the district court did not err in concluding that the defamation claim is precluded by the First Amendment."

"While [the pastor's] statement that [the plaintiffs] had engaged in 'direct fabrication of lies with the intent to hurt the reputation and the establishment' of the Church appears unrelated to church doctrine on its face, the statement nevertheless relates to the Church's reasons and motives for terminating the [plaintiffs'] membership. Examination of those reasons and motives would also require an impermissible inquiry into Church disciplinary matters."

*Id.* at 236.

In part, Plaintiffs insist the *Gaydos* and *Schoenhals* cases are so factually distinguishable from their case that the trial court erred in relying on them to set aside the jury's verdict. Examination of the alleged distinctions, however, reveals these arguments are specious.

Plaintiffs' first "significant difference" claim is that the plaintiff in *Gaydos* sued a church and church-school administrators who allegedly acted in their official capacity, whereas Plaintiffs did not sue the Church or allege Defendants were acting in their capacity as clergymen. Plaintiffs

---

**3.** The *Gaydos* court allowed civil court consideration of one defamation claim, specifically, a communication about Witthaus that was not connected to the non-renewal issue but came a substantial period of time after the personnel issues were resolved. *Id.* at 198.

cite no authority, however, for the notion that a church has to be a party to the litigation for the applicability of the Establishment Clause to be considered. Moreover, this argument ignores cases that considered First Amendment limits on secular court jurisdiction over religious disputes even though a church "entity" was not a party to the litigation. *See, e.g., Downs v. Roman Catholic Archbishop of Baltimore*, 111 Md.App. 616, 683 A.2d 808 (Md.1996); *Marshall v. Munro*, 845 P.2d 424 (Alaska 1993); *Gipson v. Brown*, 295 Ark. 371, 749 S.W.2d 297 (1988); *Heard v. Johnson*, 810 A.2d 871 (D.C.App.2002); *Vukovich v. Radulovich*, 235 Cal.App.3d 281, 286 Cal. Rptr. 547 (Cal.App.1991); *Galich v. Catholic Bishop of Chicago*, 75 Ill.App.3d 538, 31 Ill.Dec. 370, 394 N.E.2d 572 (1979).

As to the alleged pleading difference, none exists. Plaintiffs incorporated the subject letter into their pleadings, and the letter was clearly signed by Defendants in their role as pastors of the Church. *See Heard*, 810 A.2d at 878 (holding even though trustees of church were sued in individual capacities, facts clearly demonstrated "that the individuals named in [the] complaint were named precisely because they were trustees of the church and were being sued as trustees, not as individuals.").

Second, Plaintiffs argue *Gaydos* is distinguishable because the defamatory statements therein revolved around an employment contract of a church-school employee, whereas here Scott "alleges no employment or official position with ... [D]efendants." They cite no case, however, holding that the First Amendment only precludes civil courts from hearing intrachurch disputes when the subject matter is church employment contracts. Moreover, they ignore cases holding that the First Amendment precludes civil court intervention in matters involving church discipline, including the discipline of a member of the congregation. *See, e.g., Dowd v. Society of St. Columbans*, 861 F.2d 761 (1st Cir.1988); *Paul v. Watchtower Bible and Tract Soc'y of New York, Inc.*, 819 F.2d 875 (9th Cir.1987); *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F.Supp.2d 732 (U.S.D.N.J. 1999); *Burgess v. Rock Creek Baptist Church*, 734 F.Supp. 30 (U.S.D.D.C.1990); *Decker v. Tschetter Hutterian Brethren, Inc.*, 594 N.W.2d 357 (S.D.1999); *Hadnot v. Shaw*, 826 P.2d 978 (Okla.1992); *Korean Presbyterian Church of Seattle Normalization Committee v. Lee*, 75 Wash. App. 833, 880 P.2d 565 (1994); *Schoenhals*, 504 N.W.2d 233.[4]

Third, Plaintiffs point out that the *Gaydos* court ruled the plaintiff could proceed with one count of her suit because the remarks alleged to be libelous in that count were "not connected to the nonrenewal issue, but instead came a substantial period of time after the personnel issues were resolved." *Id.* at 198. They assert Defendants' letter to the "church family" fell within this *Gaydos* exception because it was not part of any disciplinary function, i.e., the letter was sent after the decision was made to discipline Scott, and he was removed from church membership. From this, Plaintiffs argue the letter only served to defame Scott.

This argument, however, has a faulty factual premise. Defendants' letter did not recount discipline *previously* imposed

---

**4.** The leading case on this particular First Amendment issue is *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976), wherein the United States Supreme Court specifically stated that no jurisdiction lies in resolution of church discipline issues concerning "the conformity of the members of the church to the standard of morals required of them[.]"

upon Scott. Rather, the letter advised the Church members of (1) an intrachurch dispute involving Scott; (2) the apparent inability to resolve the dispute; (3) Defendants' perception that "[a]t this point something must be done[;]" and (4) Defendants' decision that "we, as Pastors are removing Scott ... from membership of our church." Clearly, the so-called *Gaydos* exception has no applicability here.

■ Plaintiffs' attempts at showing meaningful distinctions between *Schoenhals* and their case are equally unavailing. Their claim that the cases are distinguishable because *Schoenhals* was decided via summary judgment, whereas Plaintiffs' judgment was set aside in response to a post-trial motion, is frivolous. Their argument that the plaintiff in *Schoenhals* sued a church, whereas Plaintiffs did not, is unsound for reasons already explained.

In sum, we find *Gaydos* and *Schoenhals* are sufficiently on point to support the trial court's conclusion that it had no subject matter jurisdiction over Plaintiffs' claims. In so stating, we have considered and now reject Plaintiffs' argument that cases such as *Gibson*, 952 S.W.2d 239, and *Weaver*, 54 S.W.3d 575, which allowed suits against churches for intentional torts, control here. Both *Gibson* and *Weaver* were considered and carefully distinguished by the *Gaydos* court. The intentional tort in *Gibson* was battery, based on allegations of sexual molestation of a child by a clergyman. *Weaver* was a case of sexual battery stemming from allegations a church elder grabbed the breast of a minister. The *Gibson* and *Weaver* disputes were neither "essentially religious in nature" nor were they "intertwined with church polity." *Gaydos*, 81 S.W.3d at 192. To the contrary, *Gibson* and *Weaver* dealt with "disputes between co-religionists when the issue [was] *purely* one of whether a religiously neutral civil law—such as a

civil action for damages for battery—[was] presented." *Id.* at 192[2]. Consequently, the First Amendment did not insulate the alleged tortfeasors in those cases from liability for their tortious conduct. *Id.* at 192[3].

The facts in *Weaver* and *Gibson* are not the facts in this case. Here, the claims of libelous remarks are clearly related to Defendants' belief that Scott's conduct within the church required he be disciplined; the comments were made during the time of the controversy concerning his removal from membership; and the remarks were made to people associated with the Church as a part of Defendants' report to the "church family" about Scott's impending removal from the Church membership. As such, they fall within the scope of First Amendment protection. *Id.* at 198.

■ We have also considered and now reject Plaintiffs' argument that "[t]he statement ... 'no pastor has filed legal charges against Scott' obviously implies [Scott] has violated criminal statutes and this can be judged *ONLY* by non-secular standards—looking at state and federal statutes[.]" Plaintiffs cite no on-point authority for this proposition nor do they explain its absence. As such, the argument is unpreserved. *See, e.g., Cooper v. Bluff City Mobile Home Sales, Inc.*, 78 S.W.3d 157, 164 (Mo.App.2002). "It is not within our province to decide arguments that are merely asserted but not developed." *Bratt v. Cohn*, 969 S.W.2d 277, 283[3] (Mo.App.1998). Moreover, the "legal charges" remark, when viewed in context, is part of the explanation to Church members that they attempted to counsel and work with Scott by following Church law, procedure, and biblical guidance without resort to secular law. It is abundantly clear that this comment is inextricably intertwined with the disciplinary question that any inquiry into its libelous nature

would also require an impermissible inquiry into religious disciplinary practices. *Gaydos*, 81 S.W.3d at 192–95; *Schoenhals*, 504 N.W.2d at 236.

We remain convinced that this case involves termination of Scott's membership in the Church for alleged grounds (whether true or false) that related to the appropriateness of his continued membership therein. As such, the trial court lacked subject matter jurisdiction and did not err when it reached that conclusion.[5] *Gaydos*, 81 S.W.3d at 197–98.

Because the trial court had no subject matter jurisdiction, it lacked authority to make any disposition other than dismissal. *Begshaw v. City of Independence*, 41 S.W.3d 500, 504[7] (Mo.App.2000) (citing *Toghiyany v. City of Berkeley*, 984 S.W.2d 560, 563 (Mo.App.1999)). Since our jurisdiction derives from that of the trial court, we have no jurisdiction. *McDonald v. City of Brentwood*, 66 S.W.3d 46, 49 (Mo. App.2001); *Viehweg v. Mello*, 8 S.W.3d 187, 188[2, 3] (Mo.App.1999). We dismiss the appeal with directions to the trial court to set aside its judgment in favor of Defendants, and thereon dismiss Plaintiffs' petition.

PREWITT, P.J., dissents in separate opinion.

PARRISH, J., concurs.

JAMES K. PREWITT, Presiding Judge, dissenting.

I respectfully dissent, although I acknowledge that the principal opinion is

well reasoned based upon precedent from Missouri and elsewhere.

Whether the remarks here were, in fact, defamatory may be questioned, but the only issue presented on this appeal is subject matter jurisdiction. Defendants assert that the trial court had no subject matter jurisdiction over this matter because of the statement in the First Amendment to the United States Constitution that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof". I believe the trial court has jurisdiction as processing a defamation action against these defendants is not "an establishment of religion or prohibiting the free exercise thereof."

How this constitutional phrase could ultimately result in prohibiting suits similar to this, I find puzzling. Not only does such a result take away the rights of those who elect to belong to an organized religion, it can shield those associated with an organized religion from some wrongful actions, a privilege not generally available to others.

The principal opinion relies extensively on *State ex rel. Gaydos v. Blaeuer*, 81 S.W.3d 186(Mo.App.2002), and its conclusion that "jurisdiction over disputes which are either essentially religious in nature or sufficiently intertwined with church polity as to constitute a threat of entanglement with religious doctrine or practice" is prohibited under the First Amendment. *Id.* at 192. Even if correct, I do not believe

5. Because we have concluded the trial court lacked subject matter jurisdiction, we need not address Plaintiffs' third point wherein they claim that Defendants waived their "Constitutional defenses" because they were not raised at the earliest opportunity. Subject matter jurisdiction cannot be waived, nor can the parties by agreement confer subject matter jurisdiction upon the court. *Commer-*

*cial Bank of St. Louis County v. James*, 658 S.W.2d 17, 21 (Mo.banc 1983); *In re Marriage of Holden*, 977 S.W.2d 951, 954 (Mo.App. 1998). Consequently, the question of subject matter jurisdiction can be raised at any time by the parties, or by this court *sua sponte*. *James*, 658 S.W.2d at 21; *Holden*, 977 S.W.2d at 954.

this logically leads to the conclusion that redress for a pastor's defamatory remarks regarding a parishioner's church membership are outside the jurisdiction of the civil courts.

Those in a pastor's position likely have a higher degree of credibility with the members than most and they should be held accountable when they violate that credibility. I cannot believe that defaming parishioners is condoned by any respectable or generally recognized religious group; thus, this case does not conflict with church government or become entangled in religious doctrine or practice.

*Gaydos* also discusses comments of James Madison, who is described as the primary draftsman of the phrase in question, for his assertion that the establishment clause was intended to deny jurisdiction over religious matters to the three branches of government. 81 S.W.3d at 196. Whether that was his intention is irrelevant, as it is not what he may have intended but what the clause says. It seems elementary that what the wording says to others is conclusive, not what someone intended the words to say, if such is not apparent in the wording. It would not be fair for others who are considering this language, whether in adoption or application, to be bound by the hidden intentions of the drafter. I see no way that the establishment clause could be a prohibition on the courts, and certainly not in this situation.

I respectfully dissent.